(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SCIALABBA, ACTING DIRECTOR, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET AL. *v.* CUELLAR DE OSORIO ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–930.   Argued December 10, 2013—Decided June 9, 2014

The Immigration and Nationality Act permits qualifying U. S. citizens and lawful permanent residents (LPRs) to petition for certain family members to obtain immigrant visas. A sponsored individual, known as the principal beneficiary, is placed into a "family preference" category based on his relationship with the petitioner. 8 U. S. C. §§1153(a)(1)–(4). The principal beneficiary's spouse and minor children in turn qualify as derivative beneficiaries, "entitled to the same status" and "order of consideration" as the principal. §1153(d). The beneficiaries then become eligible to apply for visas in order of "priority date"—that is, the date a petition was filed. §1153(e)(1). Because the immigration process often takes years or decades to complete, a child seeking to immigrate may "age out"—*i.e.,* reach adulthood and lose her immigration status—before she reaches the front of the visa queue. The Child Status Protection Act (CSPA) sets forth a remedy in that circumstance, providing that "[i]f the age of an alien is determined . . . to be 21 years of age or older," notwithstanding certain allowances for bureaucratic delay, §§1153(h)(1)–(2), "the alien's petition shall automatically be converted to the appropriate category and the alien shall retain the original priority date issued upon receipt of the original petition." §1153(h)(3).

Respondents, principal beneficiaries who became LPRs, filed petitions for their aged-out children, asserting that the newly filed petitions should receive the same priority date as their original petitions. Instead, U. S. Citizenship and Immigration Services (USCIS) gave the new petitions current priority dates. The District Court granted the Government summary judgment, deferring to the Board of Immi-

gration Appeals' (BIA's) determination that only those petitions that can be seamlessly converted from one family preference category to another without the need for a new sponsor are entitled to conversion under §1153(h)(3). The en banc Ninth Circuit reversed, holding that the provision unambiguously entitled all aged-out derivative beneficiaries to automatic conversion and priority date retention.

*Held*: The judgment is reversed, and the case is remanded.

695 F. 3d 1003, reversed and remanded.

JUSTICE KAGAN, joined by JUSTICE KENNEDY and JUSTICE GINSBURG, concluded that the BIA's textually reasonable construction of §1153(h)(3)'s ambiguous language was entitled to deference. Pp. 13–33.

(a) Because §1153(h)(3) does not speak unambiguously to the issue here, a court must defer to the BIA's reasonable interpretation. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844. The first clause of §1153(h)(3) states a condition that encompasses every aged-out beneficiary of a family preference petition. The second clause, however, does not easily cohere with the first. It prescribes a remedy that can apply to only a subset of the beneficiaries described in the first clause. This remedial prescription directs immigration officials to take the alien's petition and convert it from a category benefitting a child to an appropriate category for adults, without any change in the petition, including its sponsor, or any new filing. Moreover, this conversion is to be "automati[c]"—that is, one involving no additional decisions, contingencies, or delays. Thus, the only aliens who may benefit from §1153(h)(3)'s back half are those for whom automatic conversion is possible.

The understanding that "automatic conversion" entails nothing more than picking up the petition from one category and dropping it into another for which the alien now qualifies matches the exclusive way immigration law used the term when §1153(h)(3) was enacted. See 8 CFR §204.2(i)(1)–(3) (2002). And Congress used the word "conversion" in the identical way elsewhere in the CSPA. See, *e.g.*, §§1151(f)(2), (3).

If the term meant more than that in §1153(h)(3), it would undermine the family preference system's core premise: that each immigrant must have a qualified and willing sponsor. See §§1154(a), (b). If an original sponsor does not have a legally recognized relationship with the aged-out derivative beneficiary, another sponsor, *e.g.*, the old principal beneficiary, must be swapped in for the alien to qualify for a new family preference category. But immigration officials cannot assume that a new sponsor is eligible and willing to petition on the alien's behalf, given the numerous requirements the law imposes on family preference petitioners. See, *e.g.,* §1154(a)(1)(B)(i)(II). Nei-

ther can they figure out whether a valid sponsor exists unless he files and USCIS approves a new petition—the very thing §1153(h)(3) says is not required.

In any case, a new qualified sponsor will rarely exist at the requisite time. An alien is deemed to age out on "the date on which an immigrant visa number became available for the alien's parent." §1153(h)(1)(A). Since aging out triggers automatic conversion, the date of automatic conversion is best viewed as the same. But at that time, the aged-out beneficiary's parent cannot yet be a citizen or LPR, and so no new, qualified sponsor will be ready to step into the old one's shoes.

On the above account, §1153(h)(3)'s second clause provides a remedy to those principal and derivative beneficiaries who had a qualifying relationship with an LPR both before and after they aged out. In contrast, aliens like respondents' children—the nieces, nephews, and grandchildren of the initial sponsors—cannot qualify for "automatic conversion": they lacked a qualifying preference relationship with the initial petitioner, and so cannot fit into a new preference category without obtaining a new sponsor.

The ambiguity created by §1153(h)(3)'s ill-fitting clauses left the BIA to choose how to reconcile the statute's different commands. It reasonably opted to abide by the inherent limits of §1153(h)(3)'s remedial clause, rather than go beyond those limits so as to match the sweep of the first clause's condition. When an agency thus resolves statutory tension, ordinary principles of administrative deference require this Court to defer. See *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 666. Pp. 13–22.

(b) Respondents take issue with the BIA's interpretation, but none of their contentions is persuasive. Pp. 22–33.

(1) Respondents aver that every aged-out beneficiary could be automatically converted if immigration officials substituted new sponsors and managed the timing of conversion so that a new sponsor existed on the relevant date. These administrative maneuvers are not in keeping with the natural and long-established meaning of "automatic conversion," they require conversion to occur on a date that has no connection to the alien's aging out, and they demand administrative juggling to make automatic conversion work. And that painstakingly managed process still cannot succeed because a derivative's parent may never become able to sponsor a visa—and immigration officials cannot practically tell whether a given parent has done so. Pp. 22–27.

(2) Respondents argue that the word "and" in the second clause of §1153(h)(3) indicates that priority date retention is a benefit wholly independent of automatic conversion. But "and" does not neces-

sarily disjoin two phrases, and context suggests that the instructions work in tandem. In other statutory and regulatory provisions respecting "conversions," retention of a priority date is conditional on a conversion occurring. See, *e.g.,* §§1154(k)(1)–(3). Respondent's reading would make priority date retention conditional on something the statute nowhere mentions. And it would engender unusual results that, without some clearer statement, the Court cannot conclude that Congress intended. Pp. 27–30.

(3) Finally, respondents contend that, assuming §1153(h)(3) is ambiguous, the BIA acted unreasonably in choosing the more restrictive reading. But the BIA's interpretation benefits from administrative simplicity and fits with immigration law's basic first-come, first-served rule. By contrast, respondents would scramble the priority order Congress established by allowing aged-out derivative beneficiaries, like respondents' sons and daughters, to enter the visa queue ahead of beneficiaries who had a qualifying relationship with an LPR for a far longer time. Pp. 31–33.

THE CHIEF JUSTICE, joined by JUSTICE SCALIA, agreed that the BIA's interpretation was reasonable, but not because an agency has authority to resolve direct conflicts within a statute. There is no conflict or internal tension in §1153(h)(3). The first clause of the provision defines the persons potentially affected, but does not grant anything to anyone. The particular benefit provided by the statute—automatic conversion and retention of priority date—is found exclusively in the second clause, and that relief requires, at minimum, that an aged-out beneficiary have his own eligible sponsor who is committed to providing financial support for the beneficiary. Beyond that, Congress did not speak clearly to which petitions can be automatically converted. The BIA's reasonable interpretation of §1153(h)(3) is consistent with the ordinary meaning of the statutory terms, with the established meaning of automatic conversion in immigration law, and with the structure of the family-based immigration system. Pp. 1–4.

KAGAN, J., announced the judgment of the Court and delivered an opinion, in which KENNEDY and GINSBURG, JJ., joined. ROBERTS, C. J., filed an opinion concurring in the judgment, in which SCALIA, J., joined. ALITO, J., filed a dissenting opinion. SOTOMAYOR, J., filed a dissenting opinion, in which BREYER, J., joined, and in which THOMAS, J., joined except as to footnote 3.

Opinion of KAGAN, J.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–930

LORI SCIALABBA, ACTING DIRECTOR, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET AL., PETITIONERS *v.* ROSALINA CUELLAR DE OSORIO ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 9, 2014]

JUSTICE KAGAN announced the judgment of the Court and delivered an opinion, in which JUSTICE KENNEDY and JUSTICE GINSBURG join.

Under the Immigration and Nationality Act, 8 U. S. C. §1101 *et seq.*, citizens and lawful permanent residents (LPRs) of the United States may petition for certain family members—spouses, siblings, and children of various ages—to obtain immigrant visas. Such a sponsored individual is known as the petition's principal beneficiary. In turn, any principal beneficiary's minor child—meaning an unmarried child under the age of 21—qualifies as a derivative beneficiary, "entitled to the same [immigration] status" and "order of consideration" as his parent. §1153(d). Accordingly, when a visa becomes available to the petition's principal beneficiary, one also becomes available to her minor child.

But what happens if, sometime after the relevant petition was filed, a minor child (whether a principal or a derivative beneficiary) has turned 21—or, in immigration

lingo, has "aged out"?  The immigration process may take years or even decades to complete, due in part to bureaucratic delays associated with reviewing immigration documents and in (still greater) part to long queues for the limited number of visas available each year.  So someone who was a youngster at the start of the process may be an adult at the end, and no longer qualify for an immigration status given to minors.  The Child Status Protection Act (CSPA), 116 Stat. 927, ensures that the time Government officials have spent processing immigration papers will not count against the beneficiary in assessing his status.  See 8 U. S. C. §1153(h)(1).  But even with that provision, the beneficiary may age out solely because of the time he spent waiting in line for a visa to become available.

The question presented in this case is whether the CSPA grants a remedy to all aliens who have thus outpaced the immigration process—that is, all aliens who counted as child beneficiaries when a sponsoring petition was filed, but no longer do so (even after excluding administrative delays) by the time they reach the front of the visa queue.  The Board of Immigration Appeals (BIA or Board) said no.  It interpreted the CSPA as providing relief to only a subset of that group—specifically, those aged-out aliens who qualified or could have qualified as principal beneficiaries of a visa petition, rather than only as derivative beneficiaries piggy-backing on a parent.  We now uphold the Board's determination as a permissible construction of the statute.

I

A

An alien needs an immigrant visa to enter and permanently reside in the United States.  See §1181(a).[1]  To

_____

[1] An alien already in the United States—for example, on a student or temporary worker visa—must obtain "adjustment of status" rather than an immigrant visa to become a lawful permanent resident.  See 8

obtain that highly sought-after document, the alien must fall within one of a limited number of immigration categories. See §§1151(a)–(b). The most favored is for the "immediate relatives" of U. S. citizens—their parents, spouses, and unmarried children under the age of 21. See §§1151(b)(2)(A)(i), 1101(b)(1). Five other categories—crucial to this case, and often denominated "preference" categories—are for "family-sponsored immigrants," who include more distant or independent relatives of U. S. citizens, and certain close relatives of LPRs.[2] Specifically, those family preference categories are:

F1: the unmarried, adult (21 or over) sons and daughters of U. S. citizens;

F2A: the spouses and unmarried, minor (under 21) children of LPRs;

F2B: the unmarried, adult (21 or over) sons and daughters of LPRs;

F3: the married sons and daughters of U. S. citizens;

F4: the brothers and sisters of U. S. citizens. §§1151(a)(1), 1153(a)(1)–(4).[3]

(A word to the wise: Dog-ear this page for easy reference, because these categories crop up regularly throughout this opinion.)

————————

U. S. C. §1255(a). Because the criteria for securing adjustment of status and obtaining an immigrant visa are materially identical, we use the single term "immigrant visa" to refer to both.

[2] The "family preference" label, as used by immigration officials, applies only to these five classifications, and not to the category for "immediate relatives" of U. S. citizens. See Brief for Petitioners 3, n. 1.

[3] Immigrant visas can also go to aliens with special, marketable skills, see §§1151(a)(2), 1153(b), or to aliens from countries with historically low immigration to the United States, see §§1151(a)(3), 1153(c). None of the respondents here sought visas under those "employment-based" or "diversity" categories.

The road to obtaining any family-based immigrant visa begins when a sponsoring U. S. citizen or LPR files a petition on behalf of a foreign relative, termed the principal beneficiary. See §§1154(a)(1)(A)(i), (a)(1)(B)(i)(I), (b); 8 CFR §204.1(a)(1) (2014). The sponsor (otherwise known as the petitioner—we use the words interchangeably) must provide U. S. Citizenship and Immigration Services (USCIS) with evidence showing, among other things, that she has the necessary familial relationship with the beneficiary, see §§204.2(a)(2), (d)(2), (g)(2), and that she has not committed any conduct disqualifying her from sponsoring an alien for a visa, see, *e.g.*, 8 U. S. C. §1154(a)(1)(B)(i)(II) (barring an LPR from submitting a petition if she has committed certain offenses against minors). USCIS thereafter reviews the petition, and approves it if found to meet all requirements. See §1154(b).

For a family preference beneficiary, that approval results not in getting a visa then and there, but only in getting a place in line. (The case is different for "immediate relatives" of U. S. citizens, who can apply for and receive a visa as soon as a sponsoring petition is approved.) The law caps the number of visas issued each year in the five family preference categories, see §§1151(c)(1), 1152, 1153(a)(1)–(4), and demand regularly exceeds the supply. As a consequence, the principal beneficiary of an approved petition is placed in a queue with others in her category (F1, F2A, or what have you) in order of "priority date"—that is, the date a petition was filed with USCIS. See §1153(e)(1); 8 CFR §204.1(b); 22 CFR 42.53(a) (2013). Every month, the Department of State sets a cut-off date for each family preference category, indicating that visas (sometimes referred to by "visa numbers") are available for beneficiaries with priority dates earlier than the cut-off. See 8 CFR §245.1(g)(1); 22 CFR §42.51(b). The system is thus first-come, first-served

within each preference category, with visas becoming available in order of priority date.

Such a date may benefit not only the principal beneficiary of a family preference petition, but also her spouse and minor children. Those persons, labeled the petition's "derivative beneficiar[ies]," are "entitled to the same status, and the same order of consideration" as the principal. 8 U. S. C. §§1153(d), (h). Accordingly, when a visa becomes available for the principal, one becomes available for her spouse and minor children too. And that is so even when (as is usually but not always the case) the spouse and children would not qualify for any family preference category on their own. For example, the child of an F4 petition's principal beneficiary is the niece or nephew of a U. S. citizen, and federal immigration law does not recognize that relationship. Nonetheless, the child can piggyback on his qualifying parent in seeking an immigrant visa—although, as will be further discussed, he may not immigrate without her. See 22 CFR §40.1(a)(2); *infra*, at 6, 20–21, 31–32.

Once visas become available, the principal and any derivative beneficiaries must separately file visa applications. See 8 U. S. C. §1202(a). Such an application requires an alien to demonstrate in various ways her admissibility to the United States. See, *e.g.*, §1182(a)(1)(A) (alien may not have serious health problems); §1182(a)(2)(A) (alien may not have been convicted of certain crimes); §1182(a)(3)(B) (alien may not have engaged in terrorist activity). Notably, one necessary showing involves the U. S. citizen or LPR who filed the initial petition: To mitigate any possibility of becoming a "public charge," the visa applicant (whether a principal or derivative beneficiary) must append an "affidavit of support" executed by that sponsoring individual. §§1182(a)(4)(C)(ii), 1183a(a)(1). Such an affidavit legally commits the sponsor to support the alien, usually for at

least 10 years, with an annual income "not less than 125% of the federal poverty line." §1183a(a)(1)(A); see §§1183a(a)(2)–(3).

After the beneficiaries have filed their applications, a consular official reviews the documents and, if everything is in order, schedules in-person interviews. See §1202(h). The interviews for a principal and her children (or spouse) usually occur back-to-back, although those for the children may also come later.[4] The consular official will determine first whether the principal should receive a visa; if (but only if) the answer is yes, the official will then consider the derivatives' applications. See 22 CFR §§40.1(a)(2), 42.62, 42.81(a). Provided all goes well, everyone exits the consulate with visas in hand—but that still does not make them LPRs. See 8 U. S. C. §1154(e). Each approved alien must then travel to the United States within a set time, undergo inspection, and confirm her admissibility. See §§1201(c), 1222, 1225(a)–(b). Once again, a derivative's fate is tied to the principal's: If the principal cannot enter the country, neither can her children (or spouse). See §1153(d); 22 CFR §40.1(a)(2). When, but only when, an alien with an immigrant visa is approved at the border does she finally become an LPR.[5]

--------

[4] See Dept. of State, The Immigrant Visa Process: Visa Applicant Interview, online at http://travel.state.gov/content/visas/english/ immigrate/immigrant-process/interview/applicant_interview.html (all Internet materials as visited June 5, 2014, and available in Clerk of Court's case file).

[5] The last part of the immigration process is streamlined for aliens already residing in the United States who have applied for adjustment of status. See n. 1, *supra.* The immigration officer interviewing such an alien, upon finding her visa-eligible, may declare her an LPR on the spot. See 8 U. S. C. §1255(i)(2). But here too, the officer will not make a derivative beneficiary an LPR unless and until he approves that status for the principal. See 22 CFR §40.1(a)(2).

### B

All of this takes time—and often a lot of it. At the front end, many months may go by before USCIS approves the initial sponsoring petition.[6]  On the back end, several additional months may elapse while a consular official considers the alien's visa application and schedules an interview.[7]  And the middle is the worst. After a sponsoring petition is approved but before a visa application can be filed, a family-sponsored immigrant may stand in line for years—or even decades—just waiting for an immigrant visa to become available. See, *e.g.*, Dept. of State, Bureau of Consular Affairs, 9 Visa Bulletin, Immigrant Numbers for December 2013 (Nov. 8, 2013).

And as the years tick by, young people grow up, and thereby endanger their immigration status. Remember that not all offspring, but only those under the age of 21 can qualify as an "immediate relative" of a U. S. citizen, or as the principal beneficiary of an LPR's F2A petition, or (most crucially here) as the derivative beneficiary of any family preference petition. See *supra*, at 3, 5. So an alien eligible to immigrate at the start of the process (when a sponsor files a petition) might not be so at the end (when an immigration official reviews his documents for admission). He may have "aged out" of his original immigration status by the simple passage of time.

In 2002, Congress enacted the Child Status Protection Act (CSPA), 116 Stat. 927, to address the treatment of those once-but-no-longer-minor aliens. One section of the Act neatly eliminates the "aging out" problem for the offspring of U. S. citizens seeking to immigrate as "imme-

_____

[6] See USCIS, Processing Time Information, online at https://egov.uscis.gov/cris/processingTimesDisplayInit.do.

[7] See The Immigrant Visa Process: Interview, online at http://travel.state.gov/content/visas/english/immigrate/immigrant-process/interview.html.

diate relatives."  Under that provision, the "determination
of whether [such] an alien satisfies the [immigration law's]
age requirement . . . shall be made using [his] age" on the
date the initial petition was filed.  8 U. S. C. §1151(f)(1).
The section thus halts the flow of time for that group of
would-be immigrants: If an alien was young when a U. S.
citizen sponsored his entry, then Peter Pan-like, he re-
mains young throughout the immigration process.

A different scheme—and one not nearly so limpid—
applies to the offspring of LPRs and aliens who initially
qualified as either principal beneficiaries of F2A petitions
or derivative beneficiaries of any kind of family preference
petition.  Section 3 of the CSPA, now codified at 8 U. S. C.
§1153(h), contains three interlinked paragraphs that
mitigate the "aging out" problem for those prospective
immigrants.  The first two are complex but, with some
perseverance, comprehensible.  The third—the key provi-
sion here—is through and through perplexing.[8]

_____

[8] The full text of these three paragraphs, for the masochists among
this opinion's readers, is as follows:

"(h) Rules for determining whether certain aliens are children
"(1) In general
"For purposes of subsections (a)(2)(A) and (d) of this section, a deter-
mination of whether an alien satisfies the age requirement in the
matter preceding subparagraph (A) of section 1101(b)(1) of this title
shall be made using—
"(A) the age of the alien on the date on which an immigrant visa
number becomes available for such alien (or, in the case of subsection
(d) of this section, the date on which an immigrant visa number became
available for the alien's parent), but only if the alien has sought to
acquire the status of an alien lawfully admitted for permanent resi-
dence within one year of such availability; reduced by
"(B) the number of days in the period during which the applicable
petition described in paragraph (2) was pending.
"(2) Petitions described
"The petition described in this paragraph is—
"(A) with respect to a relationship described in subsection (a)(2)(A) of
this section, a petition filed under section 1154 of this title for classifi-

The first paragraph, §1153(h)(1), contains a formula for calculating the age of an alien "[f]or purposes of subsections (a)(2)(A) and (d)"—that is, for any alien seeking an immigrant visa directly under F2A or as a derivative beneficiary of any preference category. The "determination of whether [such] an alien satisfies the [immigration law's] age requirement"—that is, counts as under 21— "shall be made using—

> "(A) the age of the alien on the date on which an immigrant visa number becomes available for such alien (or, in the case of [derivative beneficiaries], the date on which an immigrant visa number became available for the alien's parent) . . . ; reduced by

> "(B) the number of days in the period during which the applicable petition described in paragraph (2) was pending." §1153(h)(1).

The cross-referenced second paragraph, §1153(h)(2), then explains that the "applicable petition" mentioned is the petition covering the given alien—so again, either an F2A petition filed on his own behalf or any petition extending to him as a derivative.

Taken together, those two paragraphs prevent an alien from "aging out" because of—but only because of— bureaucratic delays: the time Government officials spend reviewing (or getting around to reviewing) paperwork at

———————

cation of an alien child under subsection (a)(2)(A) of this section; or

   "(B) with respect to an alien child who is a derivative beneficiary under subsection (d) of this section, a petition filed under section 1154 of this title for classification of the alien's parent under subsection (a), (b), or (c) of this section.

   "(3) Retention of priority date

   "If the age of an alien is determined under paragraph (1) to be 21 years of age or older for the purposes of subsections (a)(2)(A) and (d) of this section, the alien's petition shall automatically be converted to the appropriate category and the alien shall retain the original priority date issued upon receipt of the original petition." 8 U. S. C. §1153(h).

what we have called the front and back ends of the immi-
gration process. See *supra*, at 6–7. The months that
elapse before USCIS personnel approve a family prefer-
ence petition ("the period during which the applicable
petition described in paragraph (2) was pending") do not
count against an alien in determining his statutory "age."
Neither do the months a consular officer lets pass before
adjudicating the alien's own visa application (the period
after "an immigrant visa number becomes available for
such alien (or . . . [his] parent)"). But the time in be-
tween—the months or, more likely, years the alien spends
simply waiting for a visa to become available—is not
similarly excluded in calculating his age: Every day the
alien stands in that line is a day he grows older, under the
immigration laws no less than in life. And so derivative
beneficiaries, as well as principal beneficiaries of F2A
petitions, can still "age out"—in other words*,* turn 21,
notwithstanding §1153(h)(1)'s dual age adjustments—
prior to receiving an opportunity to immigrate.

What happens then (if anything) is the subject of
§1153(h)'s third paragraph—the provision at issue in this
case. That paragraph states:

> "If the age of an alien is determined under para-
> graph (1) to be 21 years of age or older for the purposes
> of subsections (a)(2)(A) and (d) of this section, the
> alien's petition shall automatically be converted to the
> appropriate category and the alien shall retain the
> original priority date issued upon receipt of the origi-
> nal petition."

The provision thus first references the aged-out beneficiar-
ies of family preference petitions, and then directs immi-
gration officials to do something whose meaning this
opinion will further consider—*i.e.*, *"*automatically convert"
an alien's petition to an "appropriate category."

The Board of Immigration Appeals (BIA) addressed the

meaning of §1153(h)(3) in *Matter of Wang*, 25 I. & N. Dec. 28 (2009); its interpretation there is what we review in this case. Wang was the principal beneficiary of an F4 petition that his sister, a U. S. citizen, filed in 1992. At that time, Wang's daughter was 10 years old, and thus qualified as a derivative beneficiary. But Wang waited in line for a visa for more than a decade, and by the time his priority date finally came up, his daughter had turned 22 (even after applying §1153(h)(1)'s age-reduction formula). Wang thus obtained a visa for himself, boarded a plane alone, and entered the United States as an LPR. He then filed a new preference petition on his daughter's behalf— this one under F2B, the category for LPRs' adult sons and daughters. USCIS approved that petition, with a priority date corresponding to the date of Wang's filing. Wang contended that under §1153(h)(3), his daughter was instead entitled to "retain the original priority date" given to his sister's old F4 petition, because that petition could "automatically be converted" to the F2B category.

The Board rejected that argument. It explained that "the language of [§1153(h)(3)] does not expressly state which petitions qualify for automatic conversion and retention of priority dates." *Id.*, at 33. Given that "ambiguity," the BIA looked to the "recognized meaning" of "the phrase 'automatic conversion'" in immigration statutes and regulations—which it "presume[d]" Congress understood when enacting the CSPA. *Id.*, at 33–35. "Historically," the BIA showed, that language applied only when a petition could move seamlessly from one family preference category to another—not when a new sponsor was needed to fit a beneficiary into a different category. *Id.*, at 35. Some aged-out aliens' petitions could accomplish that maneuver, because the alien had a qualifying relationship with the original sponsor, and continued to do so upon aging out; in that event, the Board held, §1153(h)(3) ensured that the alien would retain his original priority date.

See *id.*, at 34–35.  But the F4 petition filed by Wang's sister could not "automatically be converted" in that way because Wang's daughter never had a qualifying relationship with the sponsor: "[N]o category exists for the niece of a United States citizen."  *Id.*, at 35–36.  That is why Wang himself had to file a new petition on his daughter's behalf once she aged out and could no longer ride on his sibling status.  The Board saw no evidence that Congress meant "to expand the use of the concept[ ] of automatic conversion" to reach such a case.  *Id.*, at 36.  And the Board thought such an expansion unwarranted because it would allow aliens like Wang's daughter, who lacked any independent entitlement to a visa during the years her father spent standing on the F4 queue, to "cut[ ] in line ahead of others awaiting visas in other preference categories."  *Id.*, at 38.

C

The respondents in this case are similarly situated to Wang, and they seek the same relief.  Each was once the principal beneficiary of either an F3 petition filed by a U. S. citizen parent or an F4 petition filed by a U. S. citizen sibling.  Each also has a son or daughter who, on the date of filing, was under 21 and thus qualified as a derivative beneficiary of the petition.  But as was true of Wang's daughter, the respondents' offspring had all turned 21 (even accounting for §1153(h)(1)'s age adjustments) by the time visas became available.  Accordingly, the respondents immigrated to the United States alone and, as new LPRs, filed F2B petitions for their sons and daughters.  Each argued that under §1153(h)(3), those petitions should get the same priority date as the original F3 and F4 petitions once had.  USCIS instead gave the new F2B petitions current priority dates, meaning that the sons and daughters could not leapfrog over others in the F2B line.

This case began as two separate suits, one joining many

individual plaintiffs and the other certified as a class action. In each suit, the District Court deferred to the BIA's interpretation of §1153(h)(3) in *Wang*, and accordingly granted summary judgment to the Government. See *Zhang* v. *Napolitano*, 663 F. Supp. 2d 913, 919 (CD Cal. 2009); *Costelo* v. *Chertoff*, No. SA08–00688, 2009 WL 4030516 (CD Cal., Nov. 10, 2009). After consolidating the two cases on appeal, a panel of the Ninth Circuit affirmed: Like the lower courts, it found §1153(h)(3) ambiguous and acceded to the BIA's construction. 656 F. 3d 954, 965–966 (2011). The Ninth Circuit then granted rehearing en banc and reversed in a 6-to-5 decision. 695 F. 3d 1003 (2012). The majority concluded that "the plain language of the CSPA unambiguously grants automatic conversion and priority date retention to [all] aged-out derivative beneficiaries," and that the Board's contrary conclusion "is not entitled to deference." *Id.*, at 1006.

We granted certiorari, 570 U. S. \_\_\_ (2013), to resolve a Circuit split on the meaning of §1153(h)(3),[9] and we now reverse the Ninth Circuit's decision.

## II

Principles of *Chevron* deference apply when the BIA interprets the immigration laws. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–844 (1984); *INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 424–425 (1999). Indeed, "judicial deference to the Executive Branch is especially appropriate in the immigration context," where decisions about a complex statutory scheme often implicate foreign relations. *Id.*, at 425. (Those hardy readers who have made it this far will surely

_____

[9] Compare 695 F. 3d 1003, 1006 (CA9 2012) (case below) (holding that §1153(h)(3) extends relief to all aged-out derivative beneficiaries); *Khalid* v. *Holder*, 655 F. 3d 363, 365 (CA5 2011) (same), with *Li* v. *Renaud*, 654 F. 3d 376, 385 (CA2 2011) (holding that §1153(h)(3) not merely permits, but requires the Board's contrary interpretation).

agree with the "complexity" point.)  Under *Chevron*, the statute's plain meaning controls, whatever the Board might have to say.  See 467 U. S., at 842–843.  But if the law does not speak clearly to the question at issue, a court must defer to the Board's reasonable interpretation, rather than substitute its own reading.  *Id.*, at 844.

And §1153(h)(3) does not speak unambiguously to the issue here—or more precisely put, it addresses that issue in divergent ways.  We might call the provision Janus-faced.  Its first half looks in one direction, toward the sweeping relief the respondents propose, which would reach every aged-out beneficiary of a family preference petition.  But as the BIA recognized, and we will further explain, the section's second half looks another way, toward a remedy that can apply to only a subset of those beneficiaries—and one not including the respondents' offspring.  The two faces of the statute do not easily cohere with each other: Read either most naturally, and the other appears to mean not what it says.  That internal tension makes possible alternative reasonable constructions, bringing into correspondence in one way or another the section's different parts.  And when that is so, *Chevron* dictates that a court defer to the agency's choice—here, to the Board's expert judgment about which interpretation fits best with, and makes most sense of, the statutory scheme.

Begin by reading the statute from the top—the part favoring the respondents.  Section 1153(h)(3)'s first clause—"If the age of an alien is determined under paragraph (1) to be 21 years of age or older for the purposes of subsections (a)(2)(A) and (d)"—states a condition that every aged-out beneficiary of a preference petition satisfies.  That is because all those beneficiaries have had their ages "determined under paragraph (1)" (and have come up wanting): Recall that the age formula of §1153(h)(1) applies to each alien child who originally qualified (under

"subsections (a)(2)(A) and (d)") as the principal beneficiary of an F2A petition or the derivative beneficiary of any family preference petition. On its own, then, §1153(h)(3)'s opening clause encompasses the respondents' sons and daughters, along with every other once-young beneficiary of a family preference petition now on the wrong side of 21. If the next phrase said something like "the alien shall be treated as though still a minor" (much as the CSPA did to ensure U. S. citizens' children, qualifying as "immediate relatives," would stay forever young, see *supra*, at 7–8), all those aged-out beneficiaries would prevail in this case.

But read on, because §1153(h)(3)'s second clause instead prescribes a remedy containing its own limitation on the eligible class of recipients. "[T]he alien's petition," that part provides, "shall automatically be converted to the appropriate category and the alien shall retain the original priority date." That statement directs immigration officials to take the initial petition benefitting an alien child, and now that he has turned 21, "convert[ ]" that same petition from a category for children to an "appropriate category" for adults (while letting him keep the old priority date). The "conversion," in other words, is merely from one category to another; it does not entail any change in the petition, including its sponsor, let alone any new filing. And more, that category shift is to be "automatic"— that is, one involving no additional decisions, contingencies, or delays. See, *e.g.*, Random House Webster's Unabridged Dictionary 140 (2d ed. 2001) (defining "automatic" as "having the capability of starting, operating, moving, etc., independently"); The American Heritage Dictionary 122 (4th ed. 2000) ("[a]cting or operating in a manner essentially independent of external influence"). The operation described is, then, a mechanical cut-and-paste job— moving a petition, without any substantive alteration, from one (no-longer-appropriate, child-based) category to another (now-appropriate, adult) compartment. And so

the aliens who may benefit from §1153(h)(3)'s back half are only those for whom that procedure is possible. The clause offers relief not to every aged-out beneficiary, but just to those covered by petitions that can roll over, seamlessly and promptly, into a category for adult relatives.

That understanding of §1153(h)(3)'s "automatic conversion" language matches the exclusive way immigration law used the term when Congress enacted the CSPA. For many years before then (as today), a regulation entitled "Automatic conversion of preference classification" instructed immigration officials to change the preference category of a petition's principal beneficiary when either his or his sponsor's status changed in specified ways. See 8 CFR §§204.2(i)(1)–(3) (2002). For example, the regulation provided that when a U. S. citizen's child aged out, his "immediate relative" petition converted to an F1 petition, with his original priority date left intact. See §204.2(i)(2). Similarly, when a U. S. citizen's adult son married, his original petition migrated from F1 to F3, see §204.2(i)(1)(i); when, conversely, such a person divorced, his petition converted from F3 to F1, see §204.2(i)(1)(iii); and when a minor child's LPR parent became a citizen, his F2A petition became an "immediate relative" petition, see §204.2(i)(3)—all again with their original priority dates. Most notable here, what all of those authorized changes had in common was that they could occur without any change in the petitioner's identity, or otherwise in the petition's content. In each circumstance, the "automatic conversion" entailed nothing more than picking up the petition from one category and dropping it into another for which the alien now qualified.[10]

_____

[10] The dissent responds to this fact only with a pair of non-sequiturs. *Post,* at 18–19 (opinion of SOTOMAYOR, J.). First, the dissent cites a statutory provision that does not use the word "conversion" at all, so can hardly attest to its meaning. See 8 U. S. C. §1154(a)(1)(D)(i)(III). And next, the dissent cites a regulation that post-dated the CSPA by

Congress used the word "conversion" (even without the modifier "automatic") in the identical way in two other sections of the CSPA. See *Law* v. *Siegel*, 571 U. S. ___, ___ (slip op., at 7) (2014) ("[W]ords repeated in different parts of the same statute generally have the same meaning"). Section 2 refers to occasions on which, by virtue of the above-described regulation, a petition "converted" from F2A to the "immediate relative" category because of the sponsor parent's naturalization, or from the F3 to the F1 box because of the beneficiary's divorce. 8 U. S. C. §§1151(f)(2), (3). Then, in §6, Congress authorized an additional conversion of the same nature: It directed that when an LPR parent-sponsor naturalizes, the petition he has filed for his adult son or daughter "shall be converted," unless the beneficiary objects, from the F2B to the F1 compartment—again with the original priority date unchanged. 8 U. S. C. §§1154(k)(1)–(3). (That opt-out mechanism itself underscores the otherwise mechanical nature of the conversion.) Once again, in those cases, all that is involved is a recategorization—moving the same petition, filed by the same petitioner, from one preference classification to another, so as to reflect a change in either the alien's or his sponsor's status. In the rest of the CSPA, as in the prior immigration regulation, that is what "conversion" means.

And if the term meant more than that in §1153(h)(3), it would undermine the family preference system's core

--------

years, and thus is equally irrelevant to what Congress intended. See 71 Fed. Reg. 35732, 35749 (2006) (adding 8 CFR §204.2(i)(1)(iv)). Moreover, both provisions relate to a *sui generis* circumstance in which a person can *self*-petition for a visa because her U. S. citizen or LPR relative either died or engaged in domestic abuse. In that situation, the alien's eligibility rests throughout on her connection to the deceased or abusive relative; no new party must ever come in, as one has to in a case like *Wang*, to salvage a no-longer-effective petition. See *infra*, at 18 (addressing the problems that the substitution of a new petitioner raises).

premise: that each immigrant must have a qualified spon-
sor. Consider the alternative addressed in *Wang*—if
"automatic conversion" were also to encompass the substi-
tution of a new petitioner for the old one, to make sure the
aged-out alien's petition fits into a new preference category.
In a case like *Wang*, recall, the original sponsor does
not have a legally recognized relationship with the aged-
out derivative beneficiary (they are aunt and niece); ac-
cordingly, the derivative's father—the old principal benefi-
ciary—must be swapped in as the petitioner to enable his
daughter to immigrate. But what if, at that point, the
father is in no position to sponsor his daughter? Suppose
he decided in the end not to immigrate, or failed to pass
border inspection, or died in the meanwhile. Or suppose
he entered the country, but cannot sponsor a relative's
visa because he lacks adequate proof of parentage or
committed a disqualifying crime. See §1154(a)(1)(B)(i)(II);
8 CFR §204.2(d)(2); *supra*, at 4. Or suppose he does not
want to—or simply cannot—undertake the significant
financial obligations that the law imposes on someone
petitioning for an alien's admission. See 8 U. S. C.
§§1183a(a)(1)(A), (f)(1)(D); *supra*, at 5. Immigration offi-
cials cannot assume away all those potential barriers to
entry: That would run counter to the family preference
system's insistence that a qualified and willing sponsor
back every immigrant visa. See §§1154(a)–(b). But nei-
ther can they easily, or perhaps at all, figure out whether
such a sponsor exists unless he files and USCIS approves
a new petition—the very thing §1153(h)(3) says is not
required.

Indeed, in cases like *Wang*, the problem is broader:
Under the statute's most natural reading, a new qualified
sponsor will hardly *ever* exist at the moment the petition
is to be "converted." Section 1153(h)(3), to be sure, does
not explicitly identify that point in time. But §1153(h)(1)
specifies the date on which a derivative beneficiary is

deemed to have either aged out or not: It is "the date on which an immigrant visa number became available for the alien's parent." See §§1153(h)(1)(A)–(B). Because that statutory aging out is the one and only thing that triggers automatic conversion for eligible aliens, the date of conversion is best viewed as the same. That reading, moreover, comports with the "automatic conversion" regulation on which Congress drew in enacting the CSPA, see *supra*, at 16–17: The rule authorizes conversions "upon" or "as of the date" of the relevant change in the alien's status (including turning 21))—regardless when USCIS may receive notice of the change. 8 CFR §204.2(i); but cf. *post,* at 14 (SOTOMAYOR, J., dissenting) (wrongly stating that under that rule conversion occurs upon the agency's receipt of proof of the change). But on that date, no new petitioner will be ready to step into the old one's shoes if such a substitution is needed to fit an aged-out beneficiary into a different category. The beneficiary's parent, on the day a "visa number became available," cannot yet be an LPR or citizen; by definition, she has just become eligible to *apply* for a visa, and faces a wait of at least several months before she can sponsor an alien herself. Nor, except in a trivial number of cases, is any hitherto unidentified person likely to have a legally recognized relationship to the alien. So if an aged-out beneficiary has lost his qualifying connection to the original petitioner, no conversion to an "appropriate category" can take place at the requisite time. As long as immigration law demands some valid sponsor, §1153(h)(3) cannot give such an alien the designated relief.

On the above account—in which conversion entails a simple reslotting of an original petition into a now-appropriate category—§1153(h)(3)'s back half provides a remedy to two groups of aged-out beneficiaries. First, any child who was the principal beneficiary of an F2A petition (filed by an LPR parent on his behalf) can take advantage

of that clause after turning 21. He is, upon aging out, the adult son of the same LPR who sponsored him as a child; his petition can therefore be moved seamlessly—without the slightest alteration or delay—into the F2B category. Second, any child who was the derivative beneficiary of an F2A petition (filed by an LPR on his *spouse's* behalf) can similarly claim relief, provided that under the statute, he is not just the spouse's but also the petitioner's child.[11] Such an alien is identically situated to the aged-out *principal* beneficiary of an F2A petition; indeed, for the price of another filing fee, he could just as easily have been named a principal himself. He too is now the adult son of the original LPR petitioner, and his petition can also be instantly relabeled an F2B petition, without any need to substitute a new sponsor or make other revisions. In each case, the alien had a qualifying relationship before he was 21 and retains it afterward; all that must be changed is the label affixed to his petition.[12]

In contrast, as the Board held in *Wang*, the aged-out derivative beneficiaries of the other family preference categories—like the sons and daughters of the respondents here—cannot qualify for "automatic conversion." Recall that the respondents themselves were principal beneficiaries of F3 and F4 petitions; their children, when under 21, counted as derivatives, but lacked any qualifying preference relationship of their own. The F3 derivatives were the petitioners' grandsons and granddaughters;

——————

[11] Given the statute's broad definition of "child," the only F2A derivative beneficiaries who fall outside that proviso are stepchildren who were over the age of 18 when the petitioner married the spousal beneficiary. See §1101(b)(1)(B). The Government represents that thousands of children are designated as F2A derivatives every year. See Reply Brief 18, n. 13.

[12] It is, therefore, impossible to understand the dissent's statement that conversion of such a petition to an appropriate category requires "'substantive alteration' to [the] petition." See *post*, at 19, n. 8 (opinion of SOTOMAYOR, J.).

the F4 derivatives their nephews and nieces; and none of
those are relationships Congress has recognized as war-
ranting a family preference. See 8 U. S. C. §§1153(a)(3)–
(4). Now that the respondents' children have turned 21,
and they can no longer ride on their parents' coattails,
that lack of independent eligibility makes a difference.
For them, unlike for the F2A beneficiaries, it is impossible
simply to slide the original petitions from a (no-longer-
appropriate) child category to a (now-appropriate) adult
one. To fit into a new category, those aged-out derivatives,
like Wang's daughter, must have new sponsors—and for
all the reasons already stated, that need means they
cannot benefit from "automatic conversion."

   All that said, we hold only that §1153(h)(3) permits—not
that it requires—the Board's decision to so distinguish
among aged-out beneficiaries. That is because, as we
explained earlier, the two halves of §1153(h)(3) face in
different directions. See *supra*, at 14. Section 1153(h)(3)'s
first part—its conditional phrase—encompasses every
aged-out beneficiary of a family preference petition, and
thus points toward broad-based relief. But as just shown,
§1153(h)(3)'s second part—its remedial prescription—
applies only to a narrower class of beneficiaries: those
aliens who naturally qualify for (and so can be "automati-
cally converted" to) a new preference classification when
they age out. Were there an interpretation that gave each
clause full effect, the Board would have been required to
adopt it. But the ambiguity those ill-fitting clauses create
instead left the Board with a choice—essentially of how to
reconcile the statute's different commands. The Board,
recognizing the need to make that call, opted to abide by
the inherent limits of §1153(h)(3)'s remedial clause, rather
than go beyond those limits so as to match the sweep of
the section's initial condition. On the Board's reasoned
view, the only beneficiaries entitled to statutory relief are
those capable of obtaining the remedy designated. When

an agency thus resolves statutory tension, ordinary principles of administrative deference require us to defer. See *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 666 (2007) (When a statutory scheme contains "a fundamental ambiguity" arising from "the differing mandates" of two provisions, "it is appropriate to look to the implementing agency's expert interpretation" to determine which "must give way").

## III

The respondents urge us to overturn the Board's judgment for three independent reasons. First, and principally, they take issue with the Board's—and now our—view of the limits associated with "automatic conversion": They argue that every aged-out beneficiary's petition *can* "automatically be converted" to an "appropriate category," and that the two halves of §1153(h)(3) are thus reconcilable. Second, the respondents contend that even if "automatic conversion" does not extend so far, §1153(h)(3) separately entitles each such beneficiary to the benefit of his original petition's priority date. And third, they claim that the Board's way of resolving whatever ambiguity inheres in §1153(h)(3) is arbitrary and capricious. The dissenting opinion reiterates the first two arguments, though with slight variation and in opposite order, while forgoing the third. See *post,* at 9–19 (opinion of SOTOMAYOR, J.) (hereinafter the dissent). We find none of the contentions persuasive.

## A

The respondents (and the dissent) initially aver that every aged-out beneficiary (including their own sons and daughters) can "automatically be converted" to an "appropriate" immigration category, if only immigration officials try hard enough. The Government, in the respondents' view, can accomplish that feat by substituting new spon-

sors for old ones, and by "managing the timing" of every conversion to ensure such a new petitioner exists on the relevant date. Brief for Respondents 33. And because, the respondents say, it is thus possible to align the two halves of §1153(h)(3)—even if through multiple administrative maneuvers—immigration officials are under an obligation to do so. We disagree, for reasons that should sound familiar: Several are the same as those we have just given for upholding the Board's interpretation. But still, we walk through the respondents' argument step-by-step, to show how far it departs from any ordinary understanding of "automatic conversion."

The first (and necessary) premise of that argument does not augur well for the remainder: It is the view that the "automatic conversion" procedure permits a change in the petitioner's identity. According to the respondents, the aged-out beneficiaries' parents, upon becoming LPRs, can be subbed in for the original sponsors (*i.e.*, the beneficiaries' grandparents, aunts, and uncles), and the petitions then converted to the F2B category. But as we have shown, the "automatic conversion" language—as most naturally read and as long used throughout immigration law—contemplates merely moving a petition into a new and valid category, not changing its most essential feature. See *supra*, at 15–17. That alone defeats the respondents' position.

And a further problem follows—this one concerning the date of automatic conversion. The respondents need that date to come at a time when the derivative beneficiaries' parents (the substitute petitioners) are already living in the United States as LPRs; otherwise, the petitions could not qualify for the F2B box. In an attempt to make that possible, the respondents propose that conversion be viewed as taking place when "the derivative beneficiary's visa . . . application is adjudicated." Brief for Respondents 29. But as we have (again) demonstrated, the statute is

best read as establishing a different date: that "on which an immigrant visa number became available for the alien's parent"—when, by definition, the parent is not yet an LPR. §1153(h)(1); see *supra*, at 18–19. That is the moment when a derivative ages out, which is the single change conversion reflects. By contrast, the respondents' suggested date has no connection to that metamorphosis; the date of adjudication is merely when an immigration official later *discovers* that a child has turned 21. And that date is itself fortuitous, reflecting no more than when an immigration officer got around to reviewing a visa application: The possibility of conversion would thus depend on bureaucratic vagaries attending the visa process. So the respondents' mistaken view of the timing of conversion is another off-ramp from their argument.[13]

_____

[13] Still, the respondents' view of the timing of conversion is better than the dissent's. As an initial matter, the dissent's objection to assessing conversion as of the date a visa becomes available hinges on an imaginary difficulty. That approach, the dissent complains, cannot be right because that date always "occurs before the point at which the child is determined to have aged-out." *Post,* at 15. Well, yes. The date a visa becomes available is, under the statute, the date an alien ages out (or not); and that status change of course occurs before an immigration official, reviewing a visa application, finds that it has done so. But what of it? When an official determines that an alien was no longer a child on the date a visa became available, he also assesses whether automatic conversion was available to the alien *as of* that prior date. In other words, here as elsewhere in immigration law, conversion occurs (or not) upon the date of the relevant status change—and no other. See *supra,* at 19. And once that is understood, the supposed difficulties the dissent throws up all melt away. At the time of the status change, F2A petitions can be converted without further contingencies, decisions, or delays, whereas no other petitions can. But cf. *post,* at 16, 17, n. 7 (countering, irrelevantly, that *after* an F2A petition is automatically converted, additional steps remain in the immigration process). And immigration officials later reviewing visa applications know that fact, and can treat the different classes of aged-out beneficiaries accordingly.

Further, the dissent compounds its error by suggesting a baseless alternative date: "the moment when USCIS receives proof," no matter

Yet there is more—because even after substituting a new petitioner and delaying the conversion date in a way the statute does not contemplate, the respondents must propose yet further fixes to make "automatic" conversion work for their sons and daughters. The respondents' next problem is that even on the conversion date they propose, most of them (and other derivatives' parents) were not yet LPRs, and so could not possibly be sponsors. In the ordinary course, principal and derivative beneficiaries living abroad apply for their visas at the same time and go to the consulate together for back-to-back interviews. See *supra*, at 6. And even if the parent is approved first, that alone does not make her an LPR; she still must come to this country, demonstrate her continued eligibility, and pass an inspection. See *ibid.* Thus, the respondents must recommend changes to the visa process to get the timing to work—essentially, administrative juggling to hold off the derivative beneficiary's visa adjudication until his parent has become an LPR. In particular, they suggest that the consular official defer the derivative's interview, or that the official nominally "reject the application" and then instruct the derivative to "reapply after the principal beneficiary immigrates." Brief for Respondents 30. But the need for that choreography (which, in any event, few if any of the respondents conformed to) renders the conversion process only less "automatic," because now it requires special intervention, purposeful delay, and deviation from

_____

how far in the future, that a new petitioner stands ready and willing to sponsor an aged-out beneficiary. *Post,* at 15. Not even the respondents propose such a date, and for good reason. It has no grounding in the CSPA or in any regulatory practice, and it bears no connection to the timing of the status change (aging out) that triggers conversion (or even, as the respondents' date does, to the later determination of that change). The only thing appearing to support the dissent's date is a single-minded resolve, statutory text and administrative practice notwithstanding, to grant relief to every possible aged-out beneficiary.

standard administrative practice. Conversion has become not a machine that would go of itself, but a process painstakingly managed.

And after all this fancy footwork, the respondents' scheme still cannot succeed, because however long a visa adjudication is postponed, a derivative's parent may never become able to sponsor a relative's visa—and immigration officials cannot practically tell whether a given parent has done so. We have noted before the potential impediments to serving as a petitioner—including that a parent may not immigrate, may not qualify as a sponsor, or may not be able to provide the requisite financial support. See *supra*, at 17–18. The respondents offer no way to deal with those many contingencies. Require the parent to submit a new petition? But the entire point of automatic conversion (as the respondents themselves agree) is to obviate the need for such a document. See Brief for Respondents 30, 42. Investigate the parent's eligibility in some other way? But even were that possible (which we doubt) such an inquiry would not square with the essential idea of an automatic process. Disregard the possibility that no legal sponsor exists? But then visas would go, inevitably and not infrequently, to ineligible aliens. And so the workarounds have well and truly run out on the respondents' argument.[14]

———————

[14] Nor does the dissent offer any serious aid to the respondents. The dissent initially acknowledges that automatic conversion cannot involve "additional decisions, contingencies, or delays." *Post*, at 13. But no worries, the dissent continues: "[O]nce [an alien's parent] provides confirmation of her eligibility to sponsor" the aged-out alien, the original petition "can automatically be converted to an F2B petition, with no additional decision or contingency" or (presumably) delay. *Post*, at 14. Think about that: Once every decision, contingency, and delay we have just described is over (and a parent has at long last turned out to be a viable sponsor), the dissent assures us that no further decisions, contingencies, and delays remain. Or, put differently, there are no contingencies after all the contingencies have been resolved; no deci-

That leaves us with the same statutory inconsistency with which we began.  Having followed each step of the respondents' resourceful (if Rube Goldbergish) argument, we still see no way to apply the concept of automatic conversion to the respondents' children and others like them.  And that means we continue to face a statute whose halves do not correspond to each other—giving rise to an ambiguity that calls for *Chevron* deference.

## B

The respondents, however, have another idea for reconciling §1153(h)(3)'s front and back parts (and this back-up claim becomes the dissent's principal argument).  Recall that the section's remedial clause instructs that "the alien's petition shall automatically be converted to the appropriate category *and the alien shall retain the original priority date issued upon receipt of the original petition.*"  The respondents (and the dissent) ask us to read the italicized language as conferring a benefit wholly independent of automatic conversion.  On that view, aged-out derivatives, even though ineligible for conversion, could "retain the[ir] original priority date[s]" if their parents file a *new* petition (as the respondents in fact did here "as a protective matter," Tr. of Oral Arg. 55).  And then, everyone encompassed in §1153(h)(3)'s first clause would get at least some form of relief (even if not both forms) from the section's second.  For this argument, the respondents principally rely on the word "and": "Where the word 'and' connects two" phrases as in §1153(h)(3)'s back half, the respondents contend, those terms "operate independently."

---

sions after all the decisions have been made; and no delay after all the delay has transpired.  And as if that argument were not awkward enough, consider that it would make automatic conversion turn on the filing of a new document that shows the parent's eligibility to sponsor her aged-out son or daughter—the very thing, as all parties agree, that conversion is supposed to render unnecessary.  See *supra,* at 18, 26.

Brief for Respondents 39; see *post,* at 9.

But the conjunction "and" does not necessarily *disjoin* two phrases in the way the respondents say. In some sentences, no doubt, the respondents have a point. They use as their primary example: "[I]f the boat takes on wa- ter, then you shall operate the bilge pump and you shall distribute life jackets." Brief for Respondents 39*;* see also *post,* at 10 (offering further examples). We agree that "you shall distribute life jackets" functions in that sentence as an independent command. But we can come up with many paired dictates in which the second is conditional on the first. "If the price is reasonable, buy two tickets and save a receipt." "If you have time this summer, read this book and give me a report." Or, shades of this case: "If your cell-phone contract expires, buy a new phone and keep the old number."[15] In each case, the second com- mand functions only once the first is accomplished. Whether "and" works in that way or in the respondents' depends, like many questions of usage, on the context. See, *e.g., Caraco Pharmaceutical Laboratories, Ltd.* v.

————————

[15]The dissent appears to think that something helpful to its view follows from repeating the word "shall" and changing the subject of the commands. See *post,* at 9–10. But that is not so, as some further examples show. "If you advance to the next round, my assistant shall schedule an interview and you shall come in to answer questions." "If the plane is low on fuel, the tanks shall be refilled and the pilot shall fly the route as scheduled." In these sentences, as in our prior ones, the second command is conditional on the first; all that differs is that these sentences are (much like statutes) more formal and stilted. And the dissent's citation of *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235 (1989), adds nothing to its argument. There, we construed the following provision: "[T]here shall be allowed to the holder of [a secured] claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." *Id.*, at 241. We held that the phrase "provided for under the agreement" qualifies the words "any reasonable fees, costs, or charges," but not the words "interest on such claim." *Id.,* at 241–242. What relevance that interpretation bears to this case eludes us.

*Novo Nordisk A/S*, 566 U. S. \_\_\_, \_\_\_ (2012).

Here, we think, context compels the Board's view that the instructions work in tandem. The first phrase instructs immigration officials to convert a petition (when an "appropriate category" exists); the next clarifies that such a converted petition will retain the original priority date, rather than receive a new one corresponding to the date of conversion. That reading comports with the way retention figures in other statutory and regulatory provisions respecting "conversions"; there too, retention of a priority date is conditional on a conversion occurring. See 8 U. S. C. §§1154(k)(1)–(3); 8 CFR §204.2(i); *supra*, at 16. The respondents wish to unhook the "retention" phrase from that mooring, and use it to explain what will attend a *different* event—that is, the filing of a new petition. But that is to make "retention" conditional on something the statute nowhere mentions—a highly improbable thing for Congress to have done. (If, once again, a teacher says to "read this book and give me a report," no one would think he wants a report on some unidentified subject.) And indeed, the respondents' and dissent's own examples prove this point: In not a single one of their proffered sentences is the second command contingent on the occurrence of some additional, unstated event, as it would have to be under the respondents' construction of §1153(h)(3); rather, each such command (*e.g.,* "distribute life jackets") flows directly from the stated condition (*e.g.,* "if the boat takes on water"). So by far the more natural understanding of §1153(h)(3)'s text is that retention follows conversion, and nothing else.

The respondents' contrary view would also engender unusual results, introducing uncertainty into the immigration system's operation and thus interfering with statutory goals. Were their theory correct, an aged-out alien could hold on to a priority date for years or even decades while waiting for a relative to file a new petition.

Even if that filing happened, say, 20 years after the alien aged out, the alien could take out his priority-date token, and assert a right to spring to the front of any visa line. At that point, USCIS could well have a hard time confirming the old priority date, in part because the names of derivative beneficiaries need not be listed on a visa petition. And the possibility of such leap-frogging from many years past would impede USCIS's publication of accurate waiting times. As far as we know, immigration law nowhere else allows an alien to keep in his pocket a priority date untethered to any existing valid petition. Without some clearer statement, we cannot conclude Congress intended here to create such a free-floating, open-ended entitlement to a defunct petition's priority date. See *Wang*, 25 I. & N. Dec., at 36.[16]

––––––––––

[16] The dissent claims that USCIS "administered priority date retention in exactly this manner" before the CSPA's enactment, *post*, at 10, but that confident assertion is just not so—or at least not in any way that assists the respondents. The dissent principally relies on 8 CFR §204.2(a)(4), which prior to the CSPA's enactment permitted an aged-out F2A derivative beneficiary to retain his old priority date "if [a] subsequent petition is filed *by the same petitioner*" as filed the original. Far from authorizing an open-ended, free-floating entitlement, that now-superseded regulation allowed an alien to keep his priority date only if he (unlike the respondents' offspring) had a qualifying relationship with the initial petitioner—that is, only if he fell within the group that the BIA in *Wang* thought entitled to relief. See 25 I. & N. Dec., at 34–35. And the other provisions the dissent cites (which, unlike §204.2(a)(4), continue to operate) similarly fail to support the dissent's position, because they enable an alien to retain a priority date only if attached to an existing valid petition. See 8 U. S. C. §1154(k)(3) (permitting an alien to retain a priority date associated with an existing F2B petition); 8 CFR §204.5(e) (permitting an alien to retain a priority date associated with an existing employment-based petition); §204.12(f)(1) (permitting an alien to retain a priority date associated with an existing employment-based petition for immigrating physicians).

## C

Finally, the respondents contend that even if §1153(h)(3) points at once in two directions—toward a broader scope in its first half and a narrower one in its second—the BIA acted unreasonably in choosing the more restrictive reading. In their view, the Board has offered no valid reason, consistent with "the purposes and concerns of the immigration laws," to treat their own sons and daughters less favorably than aliens who were principal and derivative beneficiaries of F2A petitions. Brief for Respondents 47. Indeed, the respondents suggest that the BIA, "for its own unfathomable reasons, disapproves of Congress's decision to allow *any* aged-out" aliens to get relief, and has thus "limited [§1153(h)(3)] to as few derivative beneficiaries as possible." *Id.*, at 55.

We cannot agree. At the least, the Board's interpretation has administrative simplicity to recommend it. Under that view, immigration authorities need only perform the kind of straightforward (*i.e.*, "automatic") conversion they have done for decades—moving a petition from one box to another to reflect a given status change like aging out. See *Wang*, 25 I. & N. Dec., at 36. The respondents, as we have shown, would transform conversion into a managed, multi-stage process, requiring immigration and consular officials around the world to sequence and delay every aged-out alien's visa adjudication until they are able to confirm that one of his parents had become a qualifying and willing F2B petitioner. And according to the Government's (incomplete) statistics, that would have to happen in, at a minimum, tens of thousands of cases every year. See Reply Brief 18, n. 13.

Still more important, the Board offered a cogent argument, reflecting statutory purposes, for distinguishing between aged-out beneficiaries of F2A petitions and the respondents' sons and daughters. See *Wang,* 35 I. & N. Dec., at 38. As earlier explained, the F2A beneficiaries

have all had a qualifying relationship with an LPR for the entire period they have waited in line—*i.e.*, since their original priority dates. See *supra*, at 19–20. That means that when immigration authorities convert their petitions, they will enter the F2B line at the same place as others who have had a comparable relationship for an equal time. The conversion thus fits with the immigration law's basic first-come-first-served rule. See 8 U. S. C. §1153(e); *supra*, at 4. By contrast, the derivative beneficiaries of F3 and F4 petitions, like the respondents' sons and daughters, lacked any qualifying relationship with a citizen or LPR during the period they waited in line. See *supra*, at 20–21. They were, instead, the grandchildren, nieces, or nephews of citizens, and those relationships did not independently entitle them to visas. If such aliens received relief under §1153(h)(3), they would jump over thousands of others in the F2B line who had a qualifying relationship with an LPR for a far longer time. That displacement would, the Board reasonably found, scramble the priority order Congress prescribed.

The argument to the contrary assumes that the respondents' sons and daughters should "receive credit" for all the time the respondents themselves stood in line. Brief for Respondents 50. But first, the time the respondents spent waiting for a visa may diverge substantially from the time their children did. Suppose, for example, that one of the respondents had stood in the F4 queue for 15 years, and with just 4 years to go, married someone with a 17-year-old son. Under the respondents' reading, that derivative beneficiary, after aging out, would get the full benefit of his new parent's wait, and so displace many thousands of aliens who (unlike him) had stood in an immigration queue for nearly two decades. And second, even when the derivative qualified as such for all the time his parent stood in line, his status throughout that period hinged on his being that parent's minor child. If his par-

ent had obtained a visa before he aged out, he would have been eligible for a visa too, because the law does not demand that a prospective immigrant abandon a minor child. But if the parent had died while waiting for a visa, or had been found ineligible, or had decided not to immigrate after all, the derivative would have gotten nothing for the time spent in line. See *supra*, at 5–6. Similarly, the Board could reasonably conclude, he should not receive credit for his parent's wait when he has become old enough to live independently. In the unavoidably zero-sum world of allocating a limited number of visas, the Board could decide that he belongs behind any alien who has had a lengthier stand-alone entitlement to immigrate.

## IV

This is the kind of case *Chevron* was built for. Whatever Congress might have meant in enacting §1153(h)(3), it failed to speak clearly. Confronted with a self-contradictory, ambiguous provision in a complex statutory scheme, the Board chose a textually reasonable construction consonant with its view of the purposes and policies underlying immigration law. Were we to overturn the Board in that circumstance, we would assume as our own the responsible and expert agency's role. We decline that path, and defer to the Board.

We therefore reverse the judgment of the Ninth Circuit and remand the case for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–930

_____

## LORI SCIALABBA, ACTING DIRECTOR, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET AL., PETITIONERS *v.* ROSALINA CUELLAR DE OSORIO ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 9, 2014]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA joins, concurring in the judgment.

I agree with much of the plurality's opinion and with its conclusion that the Board of Immigration Appeals reasonably interpreted 8 U. S. C. §1153(h)(3). I write separately because I take a different view of what makes this provision "ambiguous" under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984).

As the plurality reads section 1153(h)(3), the statute's two clauses address the issue before the Court "in divergent ways" and "do not easily cohere with each other." *Ante,* at 14. For the plurality, the first clause looks "toward the sweeping relief the respondents propose, which would reach every aged-out beneficiary of a family preference petition," while the second clause offers narrower relief that can help "only a subset of those beneficiaries." *Ibid.* Such "ill-fitting clauses," the plurality says, "left the Board with a choice—essentially of how to reconcile the statute's different commands." *Ante,* at 21.

To the extent the plurality's opinion could be read to suggest that deference is warranted because of a direct conflict between these clauses, that is wrong. Courts defer to an agency's reasonable construction of an ambiguous

statute because we presume that Congress intended to assign responsibility to resolve the ambiguity to the agency. *Chevron*, *supra,* at 843–844. But when Congress assigns to an agency the responsibility for deciding whether a particular group should get relief, it does not do so by simultaneously saying that the group should and that it should not. Direct conflict is not ambiguity, and the resolution of such a conflict is not statutory construction but legislative choice. *Chevron* is not a license for an agency to repair a statute that does not make sense.[1]

I see no conflict, or even "internal tension," *ante,* at 14, in section 1153(h)(3). See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000) (we must "interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into a[] harmonious whole'" (citation omitted)).

The statute reads:

"If the age of an alien is determined under [section 1153(h)(1)] to be 21 years of age or older for the purposes of subsections (a)(2)(A) and (d) of this section, the alien's petition shall automatically be converted to the appropriate category and the alien shall retain the original priority date issued upon receipt of the original petition." §1153(h)(3).

The first clause states a condition—one that beneficiaries from any preference category can meet—and thereby

_____

[1] *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644 (2007), is not to the contrary. There the Court confronted two different statutes, enacted to address different problems, that presented "seemingly categorical—and, at first glance, irreconcilable— legislative commands." *Id.,* at 661. We deferred to an agency's reasonable interpretation, which "harmonize[d] the statutes," in large part because of our strong presumption that one statute does not impliedly repeal another. *Id.,* at 662–669. *Home Builders* did not address the consequences of a single statutory provision that appears to give divergent commands.

defines the persons potentially affected by this provision. But the clause does not *grant* anything to anyone. I disagree with the plurality that the first clause "points toward broad-based relief," *ante,* at 21, because I do not think the first clause points toward any relief at all.[2]

Imagine a provision of the Tax Code that read: "If a student is determined to be enrolled at an accredited university, the student's cost of off-campus housing shall be deductible on her tax return." It would be immediately apparent from that provision that an enrolled student who lives on campus is not entitled to the deduction, even though the student falls within the conditional first clause. And yet no one would describe the two clauses as being in tension. If the Internal Revenue Service then interpreted the term "cost of off-campus housing" to exclude payments by a student who rents a home from his parents, a court would determine whether that interpretation was reasonable. The same is true in this case.[3]

The particular benefit provided by section 1153(h)(3) is found exclusively in the second clause—the only operative

_____

[2] For the same reason, I do not agree with the contention in JUSTICE SOTOMAYOR's dissent that the first clause of section 1153(h)(3) unambiguously "answers the precise question in this case." *Post,* at 6.

[3] JUSTICE SOTOMAYOR's dissent accuses me of "ignor[ing]" the first clause of section 1153(h)(3), "treating [that] clause as a nullity," and denying the clause "effect." *Post,* at 20–21. But that point is correct only if the reader adopts JUSTICE SOTOMAYOR's own premise, that the first clause has operative effect on its own. I give the statute's first clause precisely the (limited) effect it is meant to have: it defines who is *potentially* affected by section 1153(h)(3). JUSTICE SOTOMAYOR's response to the campus housing example proves my point by acknowledging that who gets relief under a statute depends entirely on the meaning of the statute's operative provision, not on the reach of the introductory clause. See *post,* at 21. The Court would not reject a reasonable interpretation of the term "cost of off-campus housing," as JUSTICE SOTOMAYOR's dissent would, simply because the IRS could have interpreted the term to cover more students who fall within the prefatory clause.

provision. There we are told what an aged-out beneficiary (from whatever preference category) is entitled to: His petition "shall automatically be converted to the appropriate category and the alien shall retain the original priority date." §1153(h)(3). But automatic conversion is not possible for every beneficiary in every preference category, as the plurality convincingly demonstrates. *Ante,* at 15–19. Automatic conversion requires, at minimum, that the beneficiary have his own sponsor, who demonstrates that he is eligible to act as a sponsor, and who commits to providing financial support for the beneficiary. *Ante,* at 18. Some aged-out children will not meet those prerequisites, and they cannot benefit from automatic conversion even under respondents' interpretation of the statute.[4]

Beyond those requirements, however, Congress did not speak clearly to which petitions can "automatically be converted." §1153(h)(3). Whatever other interpretations of that provision might be possible, it was reasonable, for the reasons explained by the plurality, for the Board to interpret section 1153(h)(3) to provide relief only to a child who was a principal or derivative beneficiary of an F2A petition. That interpretation is consistent with the ordinary meaning of the statutory terms, with the established meaning of automatic conversion in immigration law, and with the structure of the family-based immigration system. *Ante,* at 15–20. It also avoids the problems that would flow from respondents' proposed alternative interpretations, including the suggestion that retention of the original priority date provides a benefit wholly separate from automatic conversion. *Ante,* at 18–19, 22–32.

I concur in the judgment.

—————

[4] JUSTICE SOTOMAYOR's dissent is wrong that "the relief promised in §1153(h)(3) (priority date retention and automatic conversion) *can* be given" to every aged-out child in every preference category, *post,* at 21, and it therefore follows that the statute is ambiguous.

# SUPREME COURT OF THE UNITED STATES

No. 12–930

LORI SCIALABBA, ACTING DIRECTOR, UNITED
STATES CITIZENSHIP AND IMMIGRATION
SERVICES, ET AL., PETITIONERS *v.* ROSA-
LINA CUELLAR DE OSORIO ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 9, 2014]

JUSTICE ALITO, dissenting.

I agree with many of JUSTICE SOTOMAYOR's criticisms of the plurality opinion. I also agree with THE CHIEF JUSTICE's critique of the plurality's suggestion that, when two halves of a statute "do not easily cohere with each other," an agency administering the statute is free to decide which half it will obey. *Ante,* at 14. After all, "[d]irect conflict is not ambiguity, and the resolution of such conflict is not statutory construction but legislative choice." *Ante*, at 2 (ROBERTS, C. J., concurring in judgment). While I, like JUSTICE SOTOMAYOR, would affirm the Court of Appeals, my justification for doing so differs somewhat from hers.

As I see it, the question before us is whether there is or is not an "appropriate category" to which the petitions for respondents' children may be converted. If there is, the agency was obligated by the clear text of 8 U. S. C. §1153(h)(3) to convert the petitions and leave the children with their original priority dates. Any such conversion would be "automatic," because the agency's obligation to convert the petitions follows inexorably, and without need for any additional action on the part of either respondents or their children, from the fact that the children's ages

have been calculated to be 21 or older.[1]  If there is not an appropriate category, then the agency was not required to convert the petitions.

By the time respondents became legal permanent residents and filed new petitions for their children (if not sooner), there existed an appropriate category to which the original petitions could be converted.  That is because at that point the children all qualified for F2B preference status, as unmarried, adult children of legal permanent residents.  Accordingly, the agency should have converted respondents' children's petitions and allowed them to retain their original priority dates.[2]

Section 1153(h)(3) is brief and cryptic.  It may well contain a great deal of ambiguity, which the Board of Immigration Appeals in its expertise is free to resolve, so long as its resolution is a "permissible construction of the statute."  *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984).  But the statute is clear on at least one point: "If the age of an alien is determined under [§1153(h)(1)] to be 21 years of age or older . . . , the alien's petition *shall* automatically be converted to the appropriate category and the alien *shall* retain the original priority date issued upon receipt of the original petition" (emphasis added).  The Board was not free to disregard this clear statutory command.

---

[1] I do not believe the term "converted" demands the interpretation the plurality gives it, for the reasons advanced in JUSTICE SOTOMAYOR's dissenting opinion.

[2] The Government does not argue that respondents' children were ineligible for relief because, as a factual matter, their ages were never "determined . . . to be 21 years of age or older," §1153(h)(3), after an appropriate category became available.  I therefore do not opine on this issue.

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–930

———————

## LORI SCIALABBA, ACTING DIRECTOR, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET AL., PETITIONERS *v.* ROSA-LINA CUELLAR DE OSORIO ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 9, 2014]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins, and with whom JUSTICE THOMAS joins except as to footnote 3, dissenting.

Although the workings of our Nation's immigration system are often complex, the narrow question of statutory interpretation at the heart of this case is straightforward. Which aged-out children are entitled to retain their priority dates: derivative beneficiaries of visa petitions in all five family-preference categories, or derivative beneficiaries of petitions in only one category? The initial clause of 8 U. S. C. §1153(h)(3) provides a clear answer: Aged-out children may retain their priority dates so long as they meet a single condition—they must be "determined . . . to be 21 years of age or older for purposes of" derivative beneficiary status. Because all five categories of aged-out children satisfy this condition, all are entitled to relief.

Notwithstanding this textual command, the Board of Immigration Appeals (BIA) ruled that four of the five categories of aged-out children to whom §1153(h)(3) unambiguously promises priority date retention, are, in fact, entitled to no relief at all. See *Matter of Wang*, 25 I. & N. Dec. 28, 38–39 (2009). The Court defers to that interpretation today. In doing so, the Court does not identify any

ambiguity in the dispositive initial clause of §1153(h)(3). Indeed, it candidly admits that the clause mandates relief for "every aged-out beneficiary of a family-preference petition" in any of the five categories. *Ante*, at 21. The Court nevertheless holds that the BIA was free to ignore this unambiguous text on the ground that §1153(h)(3) also offers aged-out derivative beneficiaries a type of relief—automatic conversion—that it thinks can apply only to one of the five categories. The Court thus perceives a conflict in the statute that, in its view, permits the BIA to override §1153(h)(3)'s initial eligibility clause.

In reaching this conclusion, the Court fails to follow a cardinal rule of statutory interpretation: When deciding whether Congress has "specifically addressed the question at issue," thereby leaving no room for an agency to fill a statutory gap, courts must "interpret the statute 'as a . . . coherent regulatory scheme' and 'fit, if possible, all parts into [a] harmonious whole.'" *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 132–133 (2000) (citation omitted). Because the Court and the BIA ignore obvious ways in which §1153(h)(3) can operate as a coherent whole and instead construe the statute as a self-contradiction that was broken from the moment Congress wrote it, I respectfully dissent.

I

Under *Chevron*, the first question we ask when reviewing an agency's construction of a statute is whether "Congress has directly spoken to the precise question at issue." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). If it has, then "the court, as well as the agency, must give effect to th[at] unambiguously expressed intent." *Id.,* at 842–843. Congress has spoken directly to the question in this case.

United States citizens and lawful permanent residents (LPRs) may petition for certain relatives who reside

abroad (known as the "principal beneficiaries" of such
petitions) to receive immigrant visas. Congress has de-
fined five categories of eligible relatives—referred to as
family-preference categories—with annual limits on the
number of visas that may be issued within each category.[1]
Because the demand for visas outstrips supply, the wait
for a visa can often last many years. While a principal
beneficiary waits, her place in line is determined based on
her "priority date," the date on which her petition was
filed. See §1153(e)(1); 8 CFR §204.1(b) (2014); 22 CFR
§42.53(a) (2013). Priority dates are therefore crucial—the
earlier one's priority date, the sooner one's place will come
up in line and a visa will be available. Significantly, when
the wait ends and a principal beneficiary finally becomes
eligible to apply for a visa, 8 U. S. C. §1153(d) enables the
beneficiary's spouse and minor children (known as "deriv-
ative beneficiaries") to do so too.

This case arises from a common problem: Given the
lengthy period prospective immigrants must wait for a
visa, a principal beneficiary's child—although younger
than 21 when her parent's petition was initially filed—
often will have turned 21 by the time the parent's priority
date comes up in line. Such a child is said to have "aged
out" of derivative beneficiary treatment under §1153(d).
By way of example, respondent Norma Uy was the princi-
pal beneficiary of an F4 family-preference petition filed by
her U. S. citizen sister in February 1981. That petition
listed Norma's daughter, Ruth, who was then two years
old, as a derivative beneficiary. If Norma had reached the
front of the visa line at any time before Ruth's 21st birth-
day, §1153(d) would have enabled Ruth to accompany

_____

[1] The five categories are F1 (unmarried adult children of U. S. citi-
zens); F2A (spouses and unmarried minor children of LPRs); F2B
(unmarried adult children of LPRs); F3 (married children of U. S.
citizens); and F4 (brothers and sisters of U. S. citizens). 8 U. S. C.
§§1153(a)(1)–(4).

Norma to the United States. Unfortunately, it took more than two decades for Norma's priority date to become current, by which point Ruth was 23 and thus too old for derivative beneficiary status under §1153(d). Norma therefore immigrated alone to the United States, where she filed a new F2B petition (for unmarried children of LPRs) on Ruth's behalf. Before §1153(h)(3) was enacted, however, an immigrant in Ruth's position would have been unable to retain the February 1981 priority date from her original petition; the law would have instead required her to receive a new priority date all the way at the back of the F2B line.

Congress responded to this problem by enacting §1153(h)(3), a provision entitled "[r]etention of priority date." It states:

> "If the age of an alien is determined under [the formula specified in] paragraph (1)[2] to be 21 years of age or older for the purpos[e] of . . . [§1153(d)] of this section, the alien's petition shall automatically be converted to the appropriate category and the alien shall retain the original priority date issued upon receipt of the original petition."

The provision's structure is crucial to its meaning. The initial clause (call it the "eligibility clause") specifies who is eligible for relief. The concluding clause (call it the "relief clause") describes the two forms of relief to which eligible persons are entitled. As the title of the provision suggests, the main form of relief is the right of an aged-out derivative beneficiary to retain the priority date of her original petition. In Ruth Uy's case, such relief would mean the difference between resuming her wait near the

---

[2] As the plurality explains, *ante,* at 9–10, the formula specified in paragraph (1) subtracts out bureaucratic delays resulting from the Government's review of the relevant immigration paperwork. That formula is not at issue in this case.

front of the F2B line (which would allow her to receive a visa in short order) and being sent to the back of the line (where she would potentially have to wait an additional 27 years). Brief for Respondents 52.

The question in this case is *which* aged-out beneficiaries of family-preference petitions are eligible for priority date retention: the aged-out beneficiaries of petitions in all five family-preference categories (which would include respondents' children, who were derivative beneficiaries of F3 and F4 petitions for adult children and adult siblings of U. S. citizens, respectively), or the aged-out beneficiaries of only F2A petitions for spouses and children of LPRs (the interpretation offered by the BIA)?

Congress answered that question in §1153(h)(3)'s eligibility clause, which specifies that relief is to be conferred on any immigrant who has been "determined under [the formula specified in] paragraph (1) to be 21 years of age or older" for the purpose of §1153(d). As the plurality concedes, this clause "states a condition that every aged-out beneficiary of a preference petition satisfies"—that is, it makes eligible for relief aged-out children within each of the F1, F2A, F2B, F3, and F4 categories. *Ante,* at 14.

Congress made this clear in two mutually reinforcing ways. First, by referring to the formula set forth in "paragraph (1)," the statute incorporates that paragraph's cross-reference to §1153(h)(2). Section 1153(h)(2) in turn defines the set of covered petitions to include, "with respect to an alien child who is a derivative beneficiary under [§1153(d)], a petition filed . . . for classification of the alien's parent under [§1153(a)]." And §1153(a) encompasses all five family-preference categories. See §§1153(a)(1)–(4). Second, §1153(h)(3) promises relief to those who are found to be 21 "for the purpos[e] of . . . [§1153](d)," the provision governing derivative beneficiaries. And that provision also unambiguously covers all five family-preference categories. See §1153(d) (a minor child

is "entitled to the same status" as a parent who is the principal beneficiary of a petition filed under §1153(a)); §1153(a) (setting forth the five family-preference categories).

In short, §1153(h)(3)'s eligibility clause answers the precise question in this case: Aged-out beneficiaries within all five categories are entitled to relief. "[T]he intent of Congress is clear," so "that is the end of the matter." *Chevron*, 467 U. S., at 842.

## II
### A

Because it concedes that §1153(h)(3)'s eligibility clause unambiguously "encompasses every aged-out beneficiary of a family-preference petition," *ante,* at 21, the plurality tries to fit this case into a special pocket of *Chevron* juris-prudence in which it says we must defer to an agency's decision to ignore a clear statutory command due to a conflict between that command and another statutory provision. See *ante,* at 14, 21. Thus, unlike in the usual *Chevron* case, where ambiguity derives from the fact that the text does not speak with sufficient specificity to the question at issue, the plurality argues that this is a case in which ambiguity can only arise—if it is to arise at all—if Congress has spoken clearly on the issue in diametrically opposing ways.[3] As the plurality frames it, §1153(h)(3)'s

———————

[3] To understand the kind of conflict that can make deference appro-priate to an agency's decision to override unambiguous statutory text, consider the provisions at issue in *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644 (2007). One provision, §402(b) of the Clean Water Act, 33 U. S. C. §1342(b), commanded, "without qualification, that the [Environmental Protection Agency] 'shall ap-prove' a transfer application" whenever nine exclusive criteria were satisfied. 551 U. S., at 661. A second provision, §7(a)(2) of the Endan-gered Species Act of 1973, 16 U. S. C. §1536(a)(2), was "similarly imperative," ordering " '[e]ach Federal agency' " to ensure that its actions were " 'not likely to jeopardize' " an endangered species. 551

eligibility and relief clauses are "Janus-faced," and that conflict "makes possible alternative reasonable constructions." *Ante*, at 14.

In rushing to find a conflict within the statute, the plurality neglects a fundamental tenet of statutory interpretation: We do not lightly presume that Congress has legislated in self-contradicting terms. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory. . . . [T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously"). That is especially true where, as here, the conflict that Congress supposedly created is not between two different statutes or even two separate provisions within a single statute, but between two clauses in the same sentence. See *ibid.* ("[I]t is invariably true that intelligent drafters do not contradict themselves"). Thus, time and again we have stressed our duty to "fit, if possible, all parts [of a statute] into [a] harmonious whole." *FTC* v. *Mandel Brothers, Inc.*, 359 U. S. 385, 389 (1959); see also *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974) (when two provisions "are capable of co-existence, it is the duty of the courts . . . to regard each as effective"). In reviewing an agency's construction of a statute, courts "must," we have emphasized, "interpret the statute 'as a . . . coherent regulatory scheme'" rather than an internally inconsistent muddle, at war with itself and defective from

––––––––

U. S., at 662. "[A]pplying [§7(a)(2)'s] language literally," we observed, would contravene the "mandatory and exclusive list of [nine] criteria set forth in §402(b)," because it would "engraf[t] a tenth criterion onto" the statute. *Id.*, at 662–663. The agency accordingly could not "simultaneously obey" both commands: It could consider 9 criteria or 10, but not both. *Id.*, at 666. In that circumstance, we found it appropriate to defer to the agency's choice as to "which command must give way." *Ibid.*

the day it was written. *Brown & Williamson*, 529 U. S., at 133. And in doing so, courts should "[e]mplo[y] traditional tools of statutory construction." *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446 (1987). Each of these cautions springs from a common well: As judicious as it can be to defer to administrative agencies, our foremost duty is, and always has been, to give effect to the law as drafted by Congress.

The plurality contends that deference is appropriate here because, in its view, 8 U. S. C. §1153(h)(3)'s two clauses are "self-contradictory." *Ante,* at 33. But far from it being unworkable (or even difficult) for the agency to obey both clauses, traditional tools of statutory construction reveal that §1153(h)'s clauses are entirely compatible.

### B

The plurality argues that although §1153(h)(3)'s eligibility clause clearly encompasses aged-out beneficiaries within all five preference categories, the relief clause implies a conflicting "limitation on the eligible class of recipients." *Ante,* at 15. The plurality infers that limitation from two premises. First, it contends that no aged-out child may retain her priority date unless her petition is also eligible for automatic conversion. And second, it asserts that only aged-out F2A beneficiaries may receive automatic conversion. As a result, the plurality concludes, it was reasonable for the BIA to exclude aged-out children in the four other categories from receiving *both* automatic conversion and priority date retention, thereby rendering §1153(h)(3)'s eligibility clause defunct.

The plurality's conclusion is wrong because its premises are wrong. For one, §1153(h)(3) is naturally read to confer priority date retention as an independent form of relief to all aged-out children, regardless of whether automatic conversion is separately available. And even if that were wrong, the plurality's supposition that only F2A beneficiaries can receive automatic conversion is incorrect on its

own terms. Because either of these interpretations would treat §1153(h)(3) as a coherent whole, the BIA's construction was impermissible.

1

The most obvious flaw in the plurality's analysis is its presumption that §1153(h)(3) permits an aged-out child to retain her original priority date only if her petition can be automatically converted. That is incorrect for many reasons.

When an immigrant is determined to have aged out of derivative beneficiary status, §1153(h)(3) prescribes two forms of relief: "[T]he alien's petition shall automatically be converted to the appropriate category and the alien shall retain the original priority date issued upon receipt of the original petition." We have held that when a statute provides two forms of relief in this manner, joined by the conjunction "and," the two remedies are "distinct." *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241–242 (1989). That understanding makes particular sense here, where Congress used the mandatory word "shall" twice, once before each form of relief. See *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, 523 U. S. 26, 35 (1998) ("[T]he mandatory [term] 'shall' . . . normally creates an obligation impervious to judicial discretion"). Moreover, the two "shall" commands operate on different subjects, further reinforcing that they prescribe distinct remedies: An aged-out "alien's *petition* shall automatically be converted," but it is "the alien" *herself* who, in all events, "shall retain" her original priority date. §1153(h)(3) (emphasis added).

The plurality responds with a series of examples in which the word "and" is used to join two commands, one of which is—as the plurality asserts here—dependent on another. *Ante,* at 28, and n. 15. But as the plurality recognizes, *ante,* at 28, that is hardly the only way the

word can be used. For example: "If today's baseball game is rained out, your ticket shall automatically be converted to a ticket for next Saturday's game, and you shall retain your free souvenir from today's game." Or: "If you provide the DMV with proof of your new address, your voter registration shall automatically be converted to the correct polling location, and you shall receive in the mail an updated driver's license." It is plain in both of these examples that the two commands are distinct—the fan in the first example can keep her free souvenir even if she cannot attend next Saturday's game; the new resident will receive an updated driver's license even if she is ineligible to vote. What the plurality does not explain is why we should forgo the same understanding of §1153(h)(3)'s relief clause when that would treat the statute as a coherent whole (and when the plurality's alternative interpretation would render the statute a walking self-contradiction within the span of a few words).

With the text unavailing, the plurality turns to a policy argument. The plurality worries that if automatic conversion and priority date retention are independent benefits, aged-out beneficiaries will be able to "hold on to a priority date for years . . . while waiting for a relative to file a new petition," which might hamper U. S. Citizenship and Immigration Services (USCIS) operations. *Ante,* at 29–30. But the plurality's fears of administrative inconvenience are belied by the fact that USCIS has administered priority date retention in exactly this manner for years, with no apparent problems. Well before §1153(h)(3) was enacted, a regulation provided aged-out F2A derivative beneficiaries the ability to retain their priority dates without also providing automatic conversion. See 8 CFR §204.2(a)(4) (permitting priority date retention after a "separate petition" is filed); 57 Fed. Reg. 41053, 41059 (1992) (adopting this provision). Indeed, the USCIS continues to instruct field officers that a "separate petition" must be filed in

order for such beneficiaries to "retain" their "original priority date[s]." Adjudicator's Field Manual, ch. 21.2(c)(5), online at http://www.uscis.gov/iframe/ilink/docView/ AFM/HTML/AFM/0-0-0-1.html (all Internet materials as visited June 5, 2014, and available in Clerk of Court's case file). The notion that it is somehow impossible for an immigrant to retain her priority date contingent upon the filing of a separate petition is therefore contradicted by years of agency experience.[4]

─────────

[4] The plurality does not dispute that USCIS has administered priority date retention as a form of relief independent from automatic conversion for years. *Ante,* at 30, n. 16. It nonetheless argues that the same approach is impermissible here for the counterintuitive reason that a pre-existing regulation used express language limiting priority date retention to derivative beneficiaries of F2A petitions alone. See *ante,* at 30, n. 16 (noting that 8 CFR §204.2(a)(4) permitted an aged-out beneficiary to retain her priority date "'if the subsequent petition is filed by the same petitioner'"). Congress included no such language to limit the scope of priority date retention in 8 U. S. C. §1153(h)(3), however, which just reinforces what the eligibility clause already makes clear: Priority date retention is independently available for aged-out derivative beneficiaries of all family-preference petitions, not just F2A petitions.

The plurality also fails to account for the numerous other contexts in which USCIS has administered priority date retention as a benefit distinct from automatic conversion. See, *e.g.,* §1154(k)(3) (providing priority date retention to unmarried adult children of LPRs whose parents become naturalized citizens "[r]egardless of whether a petition is converted"); 8 CFR §204.5(e) ("A petition approved on behalf of an alien under [the employment-based immigration provisions of §1153(b)] accords the alien the priority date of the approved petition for any subsequently filed [employment] petition"); §204.12(f)(1) (a "physician beneficiary" who finds a "new employer [who] desir[es] to petition [USCIS] on the physician's behalf" must submit a new petition, but "will retain the priority date from the initial" petition). Finally, the plurality suggests that priority date retention can operate independently of automatic conversion only if the date to be retained is attached to a valid petition. *Ante,* at 30, and n. 16. But that cannot be squared with USCIS's longstanding practice of allowing F2A beneficiaries to retain the priority dates from their no-longer valid petitions upon the filing of a new petition.

In the end, the plurality suggests that we should defer to the BIA's all-or-nothing approach because "context compels" it. *Ante,* at 28. Yet fatally absent from the plurality's discussion of context is any mention of the first clause of the very same provision, which, as the plurality admits, unambiguously confers relief upon all five categories of aged-out children. That clause is dispositive, because—assuming that F2A beneficiaries alone can receive automatic conversion—a reading that treats automatic conversion and priority date retention as independent benefits is the only one that would "produc[e] a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988); see also *Home Builders*, 551 U. S., at 666 ("'It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"'").

2

Even if it were somehow impossible for an aged-out child to retain her priority date independently of automatic conversion, the plurality is wrong to view automatic conversion as a benefit that F2A beneficiaries alone may enjoy.

Section 1153(h)(3) provides that if an aged-out child qualifies for relief under the statute's eligibility clause, "the alien's petition shall automatically be converted to the appropriate category." Whether an aged-out beneficiary in a given preference category may enjoy this relief turns on how one understands the words "automatically" and "converted." Because the statute does not define the terms, we apply their ordinary meaning. See *Burrage* v. *United States*, 571 U. S. ___, ___ (2014) (slip op., at 6).

The ordinary meaning of "automatic" is "'having the capability of starting, operating, moving, etc., inde-

pendently'" based upon some predetermined predicate event, with no "additional decisions, contingencies, or delays." *Ante,* at 15 (quoting Random House Webster's Unabridged Dictionary 140 (2d ed. 2001)). The ordinary meaning of "convert" is "to change (something) into a different form." *Id.*, at 444. Here, the statute specifies the form into which an aged-out child's petition shall be changed: another petition in the "appropriate category." §1153(h)(3). Tying the terms together, then, "automatic conversion" means changing an old petition into a new petition in an appropriate category upon the occurrence of some predicate event, without a further decision or contingency.

All aged-out beneficiaries can have their petitions automatically converted under this definition. Perhaps most sensibly, all five categories of petitions may be converted to an appropriate category, without any further decision or contingency, upon a logical predicate event: when USCIS receives confirmation that an appropriate category exists. To see how this would work, recall the case of Norma Uy, and her daughter, Ruth. Norma was the principal beneficiary of an F4 petition filed by her U. S. citizen sister; Ruth was a derivative beneficiary of the same petition. Because Ruth had aged out of derivative beneficiary status prior to Norma's reaching the front of the visa line, Norma immigrated to the United States without Ruth. Once Norma became an LPR, however, she also became eligible to file a new petition on Ruth's behalf under the F2B category (unmarried adult children of LPRs), §1153(a)(2)(B). Thus, once Norma provides confirmation of that eligibility to sponsor Ruth (*i.e.,* that she is an LPR, that Ruth is her daughter, and that she has not committed disqualifying criminal conduct, see *ante,* at 4), Ruth's original F4 petition can automatically be converted to an

F2B petition, with no additional decision or contingency.[5]

Indeed, this is how USCIS already applies automatic conversion in other contexts. For example, when an LPR has filed an F2A petition on behalf of a spouse or child, and the LPR subsequently becomes a U. S. citizen, a provision entitled "*[a]utomatic conversion of preference classification*," 8 CFR §204.2(i), permits the F2A petition to be automatically converted to an "immediate relative" petition, §204.2(i)(3). See *ante,* at 16. Significantly, the predicate event that triggers this conversion is the agency's receipt of proof that the petition's sponsor has become a U. S. citizen—proof, in other words, that there is an appropriate category into which the petition can be converted.[6] Section 1153(h)(3)'s automatic conversion remedy can sensibly be administered in the same way.

The plurality's contrary conclusion that automatic conversion is impossible for all but one category of family-preference petitions hinges on three basic misunderstand-

_____

[5] Of course, just like any other beneficiary of a family visa petition, one whose petition has been automatically converted must still satisfy the requirements for actually obtaining a visa. See *ante,* at 5. For example, all visa applicants must attach an "affidavit of support" from their sponsors. 8 U. S. C. §1182(a)(4)(C)(ii). As is true for any other beneficiary, nothing stops a sponsor from declining to swear their support for the beneficiary of an automatically converted petition after a visa has become available. Converting petitions upon proof of an appropriate category therefore produces no uncertainties or contingencies that do not already exist for all family visa applicants to begin with.

[6] See Dept. of State, If You Were an LPR and Are Now a U. S. Citizen: Upgrading a Petition, online at http://travel.state.gov/visa/immigrants/types/types_2991.html#5. The regulation cited by the plurality, 8 CFR §204.2(i), is not to the contrary; it merely establishes that when an automatic conversion occurs, it shall be treated as "[e]ffective upon the date of naturalization," §204.2(i)(3). As the State Department's instructions make clear, the conversion itself takes place after the new citizen "send[s] proof of [her] U. S. citizenship to the National Visa Center." Dept. of State, If You Were an LPR and Are Now a U. S. Citizen: Upgrading a Petition.

ings. First, the plurality contends that automatic conversion is triggered not by confirmation of the existence of an appropriate category, but rather by a different predicate event: the moment when "'an immigrant visa number bec[omes] available for the alien's parent.'" *Ante,* at 19. This is a curious argument, not least because nothing in §1153(h)(3) suggests it. That provision simply makes automatic conversion available "[i]f the age of an alien is determined" to be "be 21 years of age or older" for purposes of §1153(d). Section 1153(h)(3) thus states the condition that an immigrant must satisfy to be eligible for automatic conversion, but it nowhere commands when the conversion should occur. There is no reason why conversion cannot occur at the logical point just described: the moment when USCIS receives proof that an appropriate category exists.

The plurality acknowledges that §1153(h)(3) "does not explicitly identify th[e] point in time" at which a "petition is to be 'converted.'" *Ante,* at 18. It nevertheless suggests that the date when a conversion occurs "is best viewed" as the date when a visa became available for the aged-out child's parent. *Ante,* at 19. But Congress could not have intended conversion to occur at that point for a glaring reason: The date on which a visa becomes available for an aged-out child's parent occurs before the point at which the child is determined to have aged-out under §1153(d)— the very requirement §1153(h)(3) prescribes for the aged-out child to be eligible for automatic conversion in the first place. As the plurality explains, *ante,* at 5–6, such age determinations occur when an immigration official reviews the child's derivative visa application, which invariably happens *after* a visa became available for the child's parent as the principal beneficiary. At best, then, the plurality's interpretation requires USCIS to convert petitions at a time when it does not know which petitions are eligible for conversion; at worst, it requires the automatic

conversion of petitions benefiting immigrants who will
never even qualify for such relief (*i.e.,* aged-out immi-
grants who, for any number of reasons, never file a visa
application and so are never determined by officials to be
older than 21).

Faced with this fact, the plurality falls back to the posi-
tion that automatic conversion must merely be viewed as
having occurred "*as of* th[e] . . . date" when a parent's visa
becomes available, although the actual "assess[ment]" of
the conversion will necessarily occur at some future point
in time. *Ante*, at 24, n. 13. That approach, however,
introduces precisely the kind of "additional decisions,
contingencies, and delays" that the plurality regards as
inconsistent with the ordinary meaning of "automatic,"
*ante,* at 15. For even under the plurality's view, automatic
conversion cannot actually be "assesse[d]" until and unless
the aged-out child decides to apply for a visa and officials
assessing the child's application deem her to have aged out
(events which may themselves be contingent on the child's
parent first filing her own successful visa application, see
*ante,* at 6). The far simpler approach is for conversion to
occur automatically upon the most logical moment sug-
gested by the statute: the moment when USCIS confirms
that an "appropriate category" exists, §1153(h)(3). Indeed,
the plurality fails to explain why this cannot be the proper
predicate; it simply dismisses such an approach as sup-
ported "only" by "a single-minded resolve . . . to grant
relief to every possible aged-out beneficiary." *Ante*, at 25,
n. 13. But that criticism is revealing: The "single-minded
resolve" the plurality maligns is Congress' own, for it is
Congress that expressly provided, in the eligibility clause,
for aged-out beneficiaries in all five categories to be granted
relief.

The plurality's second argument is a corollary of its
first. If automatic conversion must occur when a visa first
becomes available for a parent, the plurality frets, that

will mean an aged-out child will have her petition auto-
matically converted before immigration officials can ascer-
tain whether her parent is even qualified to sponsor her.
See *ante,* at 17–18. True enough, but that only confirms
that it makes no sense to force USCIS to convert petitions
so prematurely. The plurality's fears can all be averted by
having automatic conversion occur, as with petitions
sponsored by LPRs who later become U. S. citizens, *supra,*
at 13–15, when USCIS receives confirmation that conver-
sion is appropriate.[7]

The plurality's final argument is that something about
the term "conversion" precludes relief for all but the aged-
out derivative beneficiaries of F2A petitions. The plurality
accepts that "conversion" will always require changing
some aspects of a petition, including its preference category
(*e.g.,* from F2A to F2B) and the identity of its principal
beneficiary (*e.g.,* from an aged-out child's parent to the

_____

[7]The plurality is unsatisfied with this approach to automatic conver-
sion on the theory that, in order to eliminate all additional "decisions,
contingencies, or delays" in the process, this solution postpones the
moment of "conversion" until the necessary contingencies are satisfied.
Yet the plurality's approach does the same thing, because even on its
account, some "decisions, contingencies, or delays" must occur before
conversion can actually be assessed by immigration officials (*i.e.,* a
parent's visa must become available, the child must apply for a visa,
and immigration officials must deem her to have aged out, see *supra*, at
16). So the only question is whether the "conversion" should be consid-
ered to occur after all "decisions, contingencies, or delays" are in the
past such that there is an appropriate category for conversion, or after
only some. The former understanding would allow the unambiguous
language of the eligibility clause to be carried into effect; the latter
would preclude relief for four categories of derivative beneficiaries. In
support of its restrictive interpretation, the plurality offers only the
argument that converting a petition upon proof of an appropriate
category would require the "filing of a new document. . . that shows the
parent's eligibility to sponsor her aged-out [child]." *Ante*, at 26, n. 14.
The fact that a statute may require an agency to process a form is not a
reason to disregard a coherent reading of a statute in favor of a self-
contradictory one.

child).    But the plurality asserts that a related kind of
change is entirely off the table: a change to the identity of
the petition's sponsor.  *Ante,* at 15.  If a converted petition
requires a different sponsor than the original petition, the
plurality suggests, then it cannot be "converted" at all.

The plurality points to nothing in the plain meaning of
"conversion" that supports this distinction.    It instead
argues that a "conversion" cannot entail a change to the
identity of a petition's sponsor because that is "the exclu-
sive way immigration law used the term when Congress
enacted the CSPA."  *Ante,* at 16.  But immigration law has
long allowed petitions to be converted from one category to
another in contexts where doing so requires changing the
sponsor's identity.  In 2006, for example, the Secretary of
Homeland Security promulgated a regulatory provision
entitled "automatic conversion of preference classifica-
tion," 8 CFR §204.2(i)(1)(iv), which allows the automatic
conversion of a petition filed by a U. S. citizen on behalf of
her spouse to a widower petition if the citizen dies before
the petition is approved.  That conversion requires chang-
ing the sponsor from the citizen to the widower himself.
The fact that the agency used the word "conversion" to
refer to a process in which the petition's sponsor was
changed, just a few years after 8 U. S. C. §1153(h)(3) was
enacted, strongly suggests that the term did not have the
exclusive meaning that the plurality suggests.  Similarly,
§1154(a)(1)(D)(i)(III), a provision enacted two years before
§1153(h)(3), see Victims of Trafficking and Violence Pro-
tection Act of 2000, 114 Stat. 1522, provides that a peti-
tion filed by a battered spouse on behalf of her child "shall
be considered" a self-petition filed by the child herself if
the child ages out—a conversion that obviously requires
changing the identity of the sponsor from the battered
spouse to the aged-out child.  And §1153(h)(4) confirms
that such "self-petitioners" are entitled to §1153(h)(3)'s
automatic conversion remedy.   The plurality never ex-

plains how it can be mandatory to "convert" the identity of the sponsors in these contexts yet impermissible to "convert" the sponsors of the petitions at issue here—an understanding that is especially implausible in light of Congress' command that such petitions "shall automatically be converted to the appropriate category." §1153(h)(3).[8]

## III

The concurrence reaches the same result as the plurality does, but for a different reason. It begins by recognizing that §1153(h)(3)'s eligibility clause "states a condition" that is satisfied by aged-out "beneficiaries from any preference category." *Ante,* at 2 (ROBERTS, C. J., concurring in judgment). The concurrence thus acknowledges that the eligibility clause encompasses aged-out beneficiaries of family-preference petitions in the F1, F2A, F2B, F3, and F4 categories.

The concurrence nonetheless concludes that the BIA was free to exclude F1, F2B, F3, and F4 beneficiaries from

———————

[8] Moreover, had Congress actually intended to permit relief only where a new petition has the same sponsor as the original petition, it had a ready model in the language of a pre-existing regulation. See 8 CFR §204.2(a)(4) (conferring priority date retention on a derivative beneficiary only "if the subsequent petition is filed by the same petitioner"). If it had wanted to limit §1153(h)(3) to just the beneficiaries preferred by the BIA, "Congress could easily have said so." *Kucana* v. *Holder*, 558 U. S. 233, 248 (2010).

The plurality's argument that a "conversion" cannot entail a change to a petition's sponsor ultimately boils down to this: A "conversion" cannot include "any substantive alteration" to a petition, *ante,* at 15, except when it can. For example, a "conversion" can (indeed, must) entail changing a petition's family-preference category and changing the petition's principal beneficiary (from the aged-out child's parent to the child herself). And the plurality concedes that in other contexts, conversion must entail changing the identity of a petition's sponsor from the beneficiary's qualifying relative to the beneficiary himself. *Ante,* at 16–17, n. 10. The plurality does not explain why the word "conversion" can encompass all of these other substantive alterations, but not a change to the identity of a petition's sponsor in just this case.

the clear scope of the eligibility clause because of a perceived ambiguity as to which beneficiaries can receive "automatic conversion." See *ante*, at 4 ("Congress did not speak clearly to which petitions can 'automatically be converted'"). In other words, the concurrence concludes that it was reasonable for the agency to ignore the clear text of the eligibility clause because the phrase "automatic conversion" *might* be read in a manner that would benefit F2A beneficiaries alone.

This is an unusual way to interpret a statute. The concurrence identifies no case in which we have deferred to an agency's decision to use ambiguity in one portion of a statute as a license to ignore another statutory provision that is perfectly clear. To the contrary, "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.,* 484 U. S., at 371.

The concurrence justifies its conclusion only by treating the eligibility clause as a nullity. The concurrence is quite candid about its approach, arguing that §1153(h)(3)'s relief clause is its "only operative provision" and that the eligibility clause does not "*grant* anything to anyone." *Ante*, at 3. Yet "[i]t is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955). And there is an easy way to give meaning to the eligibility clause: The clause identifies who is entitled to the benefits specified in the ensuing relief clause.

The concurrence relies ultimately on an irrelevant hypothetical: "If a student is determined to be enrolled at an accredited university, the student's cost of off-campus housing shall be deductible on her tax return." *Ante,* at 3. In this example, the concurrence points out, it is "apparent. . . that an enrolled student who lives on campus is not

entitled to the deduction, even though the student falls within the conditional first clause." *Ibid.* That is correct, but it says nothing about this case. For in the hypothetical, it is plain that the promised relief (a tax deduction for off-campus housing) cannot apply to the persons at issue (students who live on campus). Here, however, the relief promised in §1153(h)(3) (priority date retention and automatic conversion) *can* be given to persons specified in the initial eligibility clause (aged-out children in all five family-preference categories). See *supra,* at 9–19. And once one recognizes that aged-out children in each category unambiguously covered by the eligibility clause can receive relief, the BIA's view that *no* children in four of those categories can ever receive *any* relief cannot be reasonable.[9]

\*    \*    \*

Congress faced a difficult choice when it enacted §1153(h)(3). Given the "zero-sum world of allocating a limited number of visas," *ante,* at 33, Congress could have

————————

[9] More fundamentally, the concurrence's hypothetical is irrelevant because it altogether ignores a critical feature of the statute before us: §1153(h)(2)'s express enumeration of the covered petitions to include petitions filed within the F1, F2A, F2B, F3, and F4 preference categories. See *supra,* at 5–6. A proper analogy would therefore be a provision that says the following: "If a student is determined to be enrolled at an accredited junior college, community college, or 4-year college, the student's room and board shall be tax-deductible and the student shall receive financial aid." Is there any permissible reading of this provision under which, although expressly covered in the eligibility clause, all junior and community college students are categorically forbidden to receive *both* the tax deduction and financial aid? Of course not. And that would be true even if the term "room and board" were ambiguous and thus open to an interpretation under which only 4-year students could receive the tax deduction. Likewise here, where F1, F2B, F3, and F4 derivative beneficiaries may not be categorically excluded from relief because they are indisputably covered by §1153(h)(3)'s eligibility clause and able to receive the relief described in the relief clause.

required aged-out children like Ruth Uy to lose their place in line and wait many additional years (or even decades) before being reunited with their parents, or it could have enabled such immigrants to retain their place in line—albeit at the cost of extending the wait for other immigrants by some shorter amount. Whatever one might think of the policy arguments on each side, however, this much is clear: Congress made a choice. The plurality's contrary view—that Congress actually delegated the choice to the BIA in a statute that unambiguously encompasses aged-out children in all five preference categories and commands that they "shall retain the[ir] original priority date[s]," §1153(h)(3)—is untenable.

In the end, then, this case should have been resolved under a commonsense approach to statutory interpretation: Using traditional tools of statutory construction, agencies and courts should try to give effect to a statute's clear text before concluding that Congress has legislated in conflicting and unintelligible terms. Here, there are straightforward interpretations of §1153(h)(3) that allow it to function as a coherent whole. Because the BIA and the Court ignore these interpretations and advance a construction that contravenes the language Congress wrote, I respectfully dissent.