PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4434
_____

SHALOM PENTECOSTAL CHURCH;
CARLOS ALENCAR

v.

ACTING SECRETARY UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; DIRECTOR UNITED
STATES CITIZENSHIP AND IMMIGRATION SERVICES;
DIRECTOR OF THE CALIFORNIA SERVICE CENTER
OF USCIS; DIRECTOR UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES ADMINISTRATIVE
APPEALS OFFICE, in their official capacity,

Appellants

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-11-cv-04491)
District Judge: Honorable Renee Marie Bumb
_____

Argued: September 8, 2014

Before: RENDELL, GREENAWAY, JR., and KRAUSE,
Circuit Judges

(Opinion filed April 7, 2015)
_____

WILLIAM A. STOCK, ESQUIRE (Argued)
Klasko, Rulon, Stock & Seltzer
1601 Market Street, Suite 2600
Philadelphia, PA 19103

*Counsel for Appellees*

GEOFFREY FORNEY, ESQUIRE (Argued)
United States Department of Justice
Office of Immigration Litigation
Room 6223
450 5th Street, N.W.
Washington, DC 20001

MELISSA S. LEIBMAN, ESQUIRE
United States Department of Justice
Office of Immigration Litigation
Room 6022
P.O. Box 868
Ben Franklin Station
Washington, DC 20001

*Counsel for Appellants*

SCOTT D. POLLOCK, ESQUIRE
Suite 2200
105 West Madison

Chicago, IL 60602

*Counsel for Amicus Appellee*

_____

OPINION OF THE COURT

_____

KRAUSE, <u>Circuit Judge</u>

The Immigration and Nationality Act (INA) enables an immigrant to obtain a visa as a "special immigrant religious worker" if the immigrant meets certain statutory criteria, including that he has been "carrying on" religious work for at least the two years preceding the filing of the visa petition. This case presents the question whether a requirement imposed in the relevant regulation that this religious work have been carried on "in lawful immigration status" crosses the line from permissible statutory interpretation by the responsible agency to *ultra vires* regulation contrary to the clear intent of Congress. None of our sister Courts of Appeals have yet weighed in on this issue, but the District Court here concluded that the regulation is *ultra vires* because it contradicts the plain language of the INA. *Shalom Pentecostal Church v. Beers*, No. 11-4491, 2013 U.S. Dist. LEXIS 185091, at *19 (D.N.J. Sept. 16, 2013). For the reasons set forth below, we agree. We therefore will affirm the District Court's order as to the invalidity of the regulation but will reverse and remand for further fact-finding on the remaining visa criteria.

3

## I. Factual Background and Procedural History

### A. Alencar's Visa Application

None of the material facts in this case are disputed. Appellee Carlos Alencar, a Brazilian national, travelled with his family to the United States on a B-2 nonimmigrant tourist visa in June 1995. The visa authorized Alencar to stay in the United States until December 1995, but he has remained in the United States unlawfully since the visa expired. Alencar was not authorized to work under the terms of his B-2 visa, nor did he otherwise obtain employment authorization.

Alencar has been seeking legal immigration status as a special immigrant religious worker since 1997, when he first petitioned for an I-360 visa petition, which would eventually qualify him to seek permanent residency status. That petition and a second petition filed by Alencar in 2001 were both rejected by the United States Citizenship and Immigration Service (CIS). Nonetheless, Alencar began working as a senior pastor for the Shalom Pentecostal Church (the "Church") in 1998 and continued in that capacity through the filing of this appeal.

The I-360 petition at issue here was filed by the Church on Alencar's behalf in 2009. CIS again denied the petition and, in this instance, did so on the sole ground that the Church had failed to establish, pursuant to newly promulgated 8 C.F.R. 204.5(m)(4) and (11) (the "Regulation"), that Alencar had been "performing full-time work in *lawful immigration status* as a religious worker for at least the two-year period immediately preceding the filing of the petition." (App. 90 (emphasis added).) The CIS Administrative Appeals Office dismissed the Church's

4

appeal, concluding, consistent with the Regulation, that Alencar's "religious employment in the United States during the qualifying period was not authorized under United States immigration law." (App. 66.)

In 2011, Alencar and the Church filed a complaint in the United States District Court for the District of New Jersey, challenging the denial of the I-360 petition on several grounds, including that the Regulation was *ultra vires* to the INA.[1] The District Court denied the Government's motion to dismiss and subsequently granted plaintiffs' motion for summary judgment, invalidating the Regulation on the grounds that the statutory language was unambiguous and that the Regulation's addition of the "lawful status" requirement was inconsistent with the statutory scheme.[2] The District Court further held that any remand would be futile and ordered CIS to grant Alencar's I-360 petition.

---

[1] Alencar and the Church also argued below that the Regulation violates the Religious Freedom Restoration Act (42 U.S.C. § 2000bb) and the First and Fourteenth Amendments of the Constitution of the United States. The District Court dismissed these claims, and Appellees have not challenged those rulings on appeal.

[2] The majority of the district courts to have considered this question have come to the same conclusion. *See Congregation of the Passion v. Johnson*, No. 13-2275, 2015 WL 518284, at *7 (N.D. Ill. Feb. 6, 2015); *Shia Ass'n of Bay Area v. United States*, 849 F. Supp. 2d 916 (N.D. Cal. 2012). *But see Islamic & Educ. Ctr. Ezan of Greater Des Moines v. Napolitano*, 826 F. Supp. 2d 1122 (S.D. Iowa 2011).

### B. The Visa Petition Process

The INA provides for preference in the issuance of visas to five categories of workers: (1) priority workers, (2) aliens with advanced degrees or of exceptional ability, (3) skilled workers and professionals, (4) special immigrants, including religious workers, and (5) foreign investors. 8 U.S.C. § 1153(b)(1)-(5). The subcategory at issue in this case—the special immigrant religious worker program—permits ministers and nonminister religious workers to immigrate in legal status to the United States to perform religious work. 8 U.S.C. § 1101(a)(27)(C). In order to become a legal permanent resident (LPR) through the special immigrant religious worker program, an alien or his prospective employer must complete two steps. First, the applicant must successfully petition CIS for an I-360 visa. 8 C.F.R. § 204.5(a), (c), (m)(6). If granted that visa, the alien may apply to the Attorney General for permanent adjustment of status. 8 U.S.C. § 1255.[3]

This case focuses on the first step of this process. The INA requires that, in order to qualify for an I-360 visa as a special immigrant religious worker, the immigrant must meet three criteria: (1) membership in a religious denomination

---

[3] At the second step of this process, an alien with an approved visa petition who is already in the United States may seek adjustment to LPR status, subject to a variety of restrictions and the Attorney General's discretion. 8 U.S.C. § 1255(a). Alternatively, if abroad, an alien may apply for an immigrant visa from the local American consulate. 8 C.F.R. § 204.5(n).

with a bona fide nonprofit religious organization in the United States for two years immediately preceding the petition, (2) intent to enter the United States or change status within the United States solely for the purpose of working as a minister or in another religious vocation, and (3) the "carrying on" of such religious work continuously for at least the two years before applying.  8 U.S.C. § 1101(a)(27)(C)(i)-(iii).[4]

---

[4]     In full, this section of the INA provides:

The term "special immigrant" means—
. . .
(C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—
> (i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;
> (ii) seeks to enter the United States—
>> (I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,
>> (II) before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or
>> (III) before September 30, 2015, in order to work for the organization . . . at the

7

As it is authorized to do under 8 U.S.C. § 1103(a)(3), CIS has promulgated regulations elaborating on these statutory qualifications. Under the regulations, the visa petition procedure begins when either an alien or a person on the alien's behalf applies for an I-360 visa. That visa, if granted by CIS, classifies an alien as a special immigrant religious worker. The filer must present evidence that the alien meets the statutory requirements as expounded by the regulations. For example, while the statute requires that the alien seek to enter the United States "solely for the purpose of carrying on the vocation of a minister," 8 U.S.C. § 1101(a)(27)(C)(ii)(I), the regulations specify that the intended religious work be both full time and compensated. 8 C.F.R. § 204.5(m)(2).

In 2008, CIS amended 8 C.F.R. § 204.5(m) to require that an alien have worked "either abroad or in *lawful immigration status* in the United States, and . . . continuously for at least the two-year period immediately preceding the filing of the petition" to be eligible for classification as a special immigrant religious worker. 8 C.F.R. § 204.5(m)(4) (emphasis added). The amendments also added that "[q]ualifying prior experience . . . if acquired in the United States, must have been authorized under United States

_____

> request of the organization in a religious vocation or occupation; and
> (iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i).

8 U.S.C. § 1101(a)(27)(C).

8

immigration law." 8 C.F.R. § 204.5(m)(11). The Regulation thus disqualifies applicants like Alencar who did "carry on" otherwise qualifying religious work during the two years before they filed a visa application but did so without lawful status.

## II.    Jurisdiction and Standard of Review

The Government filed a timely notice of appeal on November 13, 2013. The District Court had jurisdiction pursuant to 5 U.S.C. § 702 of the Administrative Procedure Act (APA), and we have jurisdiction to hear this appeal under 28 U.S.C. § 1291. We review the legal conclusions related to standing de novo. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013). We apply de novo review to the District Court's grant of summary judgment in a case brought under the APA. *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 195 (3d Cir. 2010).

## III.    Discussion

The Government raises two issues on appeal. First, it contends that Alencar and the Church lack standing to challenge the denial of the I-360 petition. Specifically, the Government contests: (1) the constitutional standing of both Alencar and the Church, (2) Alencar's standing under CIS regulation 8 C.F.R. § 103.3(a)(1)(iii)(B), and (3) Alencar's right to sue under the INA. Second, the Government argues that the District Court erred in ruling that the Regulation is *ultra vires*. We address these issues in turn.

9

### A. Standing

### 1. Constitutional Standing

Article III of the Constitution requires that a plaintiff establish standing in order for his case to be justiciable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). Constitutional standing has three elements: injury in fact, causation, and redressability. *Id.* at 560-61. Here, the Government challenges only the third. For an injury to be redressable, the plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 561 (internal quotation marks and citation omitted). If the plaintiff is the object of government action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62.

The Government asserts that no matter the result of this appeal, Alencar will not be eligible for adjustment to LPR status for at least ten years, so that any victory in the current proceeding will be "pyrrhic." (Appellants' Br. 17 (citing App. 36).) Even if an I-360 visa is granted, the Government points out, an alien is statutorily ineligible to adjust status from within the United States if he worked in unlawful immigration status for more than 180 days. 8 U.S.C. § 1255(c)(2), (k)(2). But an alien who seeks to adjust status from outside the United States and was present unlawfully in the United States for one year or more is inadmissible to the United States for ten years from his date of departure. 8 U.S.C. §§ 1182(a)(9)(B)(i)(II); 1201(g)(1). Alencar worked in unlawful immigration status for more than 180 days and has been present unlawfully in the United States for more

than one year. Hence, he will be ineligible for adjustment of status for at least ten years.

This syllogism, however valid, does not bear on the question of Alencar's standing to challenge the denial of his I-360 petition on the basis of the legality of the Regulation. As a threshold matter, the Government's contention that relief must be immediate to satisfy constitutional standing finds no support in our precedent. Rather, as the Supreme Court made clear in *Lujan*, redressability hinges on the availability and likelihood of relief, rather than the immediacy of relief. *See* 504 U.S. at 561-62. Indeed, a requirement of immediate redressability would be particularly inappropriate in the immigration context, where there is frequently a lengthy delay between a favorable decision and the availability of relief. *See Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2199 (2014).

In any event, Alencar is seeking a visa at this point, not permanent adjustment of status. While obtaining a visa is a prerequisite to applying for LPR status, the INA makes clear that the visa petition process and the adjustment of status process are distinct. *Compare* 8 U.S.C. § 1153, *with* 8 U.S.C. § 1255; *see Matter of O-----*, 8 I & N Dec. 295, 297 (BIA 1959) ("The visa petition procedure is concerned merely with the question of status. It does not concern itself with substantive questions of inadmissibility . . . ."). Even the Government acknowledges that "the INA sets forth distinct criteria for applicants qualifying as special immigrant religious workers (immigrant visa) and for those seeking to adjust status (adjustment of status)." (Appellants' Br. 31.)

We are guided by the Supreme Court's approach in *Monsanto Co. v. Geertson Seed Farms*, where the Court

11

analyzed redressability in the context of multi-part proceedings based on the availability of relief at a given step, rather than the likelihood of achieving the ultimate goal. *See* 561 U.S. 139, 151-53 (2010) (holding that farmers had standing to challenge restrictions on an agency's ability to deregulate a genetically-engineered product even though their ultimate goal of deregulation could not be achieved without further agency action). In Alencar's case, that step is the petition for an I-360 visa. If Alencar satisfies § 1101(a)(27)'s criteria, the statute provides in mandatory terms that a visa "shall be made available," subject to specified numerical limits. 8 U.S.C. § 1153(b)(4). Thus, as the Sixth Circuit aptly observed in *Patel v. USCIS,* when an alien's visa petition is denied, he has "lost a significant opportunity to receive an immigrant visa" and "that lost opportunity is itself a concrete injury." 732 F.3d 633, 638 (6th Cir. 2013) (quoting *Abboud v. INS*, 140 F.3d 843, 847 (9th Cir. 1998)).

The Government's insistence that we determine at the visa petition stage the redressability of a different and potential injury, *i.e.,* Alencar's prospects for eventual adjustment of status, would turn the INA's carefully considered statutory scheme on its head. Congress has provided for separate and sequential processes to obtain an I-360 visa and to apply for adjustment of status. *Compare* 8 U.S.C. § 1153, *with* 8 U.S.C. § 1255. At the second stage, CIS—not the federal courts—ordinarily adjudicates an application for adjustment of status in the first instance, 8 C.F.R. § 245.2(a)(1), and Congress has expressly excluded from judicial review the Attorney General's discretionary decision regarding final adjustment of status. 8 U.S.C.

12

§§ 1252(a)(2)(B)(i), 1255(a).[5]  It would hardly make sense, then, to base an alien's standing at the first stage on a court's prognostication about that Executive Branch decision at the second.

Instead, we hold that the injury at that first stage is redressable by judicial action, and Appellees therefore have constitutional standing to challenge the denial of the I-360 petition.

## 2. Regulatory Standing

The Government contends that Alencar cannot proceed, even if he has Article III standing, because a CIS regulation, 8 C.F.R. § 103.3(a)(1)(iii)(B), authorizes an administrative appeal only by an "affected party," which is defined as "the person or entity with legal standing in a proceeding," and which "does not include the beneficiary of a petition."  8 C.F.R. § 103.3(a)(1)(iii)(B).  Courts have relied on this regulation to uphold agency decisions dismissing visa beneficiaries for lack of standing in the context of administrative proceedings.  *See, e.g.*, *Echevarria v. Keisler*, 505 F.3d 16, 18 (1st Cir. 2007); *Kale v. INS*, 37 F. App'x 90 (5th Cir. 2002) (per curiam) (unpublished table decision).

We cannot agree that this regulation bars Alencar's claim here.  Even assuming that it applies outside the context

---

5    If an alien has been placed in deportation or removal proceedings, the Immigration Judge hearing the proceeding has exclusive jurisdiction over the application for adjustment of status, subject to certain exceptions.  8 C.F.R. § 1245.2(a)(1).

of administrative proceedings, this regulation must be read in tandem with 8 C.F.R. § 204.5(c). As the government points out, § 204.5(c) provides that, for most of the employment-based visa categories, only the "employer" has standing to file a petition, rendering the alien the "beneficiary" and, consistent with the premise of the Government's argument, not an "affected party" for purposes of standing on administrative appeal.[6] The Government overlooks, however, the specific carve-out within § 204.5(c), which provides that, for special immigrant religious workers, "the alien, or any person in the alien's behalf" has standing to file. For this category of visa petitioner, the alien is not merely a "beneficiary," but instead, either directly or through someone on his behalf, has legal standing. Thus, contrary to the Government's position, the "affected party" authorized to undertake an administrative appeal, even under CIS regulations, includes the special immigrant religious worker himself.

### 3. The Zone-of-Interests Test

Even where standing is otherwise satisfied, an aggrieved party may be precluded from pursuing relief if the interest it seeks to vindicate falls outside the "zone of

---

[6]     In any event, the cases relied upon by the Government appear limited to the administrative agency context, leading some courts to hold that § 103.3(a)(1)(iii)(B) only governs administrative proceedings and does not apply to standing in federal court at all. *See, e.g.*, *Ore v. Clinton*, 675 F. Supp. 2d 217, 223 (D. Mass. 2009); *Maramjaya v. USCIS*, No. 06-2158, 2008 WL 9398947, at *4 (D.D.C. Mar. 26, 2008).

interests" protected by the statute invoked. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-89 (2014). The Government argues that Alencar lacks this "zone of interest" or "prudential standing,"[7] baldly asserting that the INA's "primary purpose" is "to protect American workers, while providing employers with limited access to foreign labor, only when absolutely necessary," and therefore "aliens do not fall within any interest protected by the statute." (Appellants' Reply Br. 4-5 (internal citations omitted).) However, the zone-of-interests test for actions under the APA is "not especially demanding," foreclosing suit "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Lexmark*, 134 S. Ct. at 1389 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012)).

The text of the INA leaves no doubt that the interests of employment-based visa petition applicants, and special immigrant religious workers in particular, are directly related

---

[7] The Supreme Court has criticized the use of "prudential standing" to describe this doctrine because the question of whether a plaintiff has a cause of action under a statute hinges on whether Congress has granted the plaintiff a cause of action, rather than whether courts think it should have done so. *Lexmark*, 134 S. Ct. at 1386-88 (describing the phrase "prudential standing" as "misleading"); *see also Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675-76 (D.C. Cir. 2013) (Silberman, J., concurring) (stating "'prudential standing' is a misnomer"). Therefore, erstwhile "prudential standing" is referred to here as the "zone-of-interests test."

to the purposes of the INA.  The statute specifies the five categories of workers who receive preferential treatment in the visa process.  8 U.S.C. § 1153(b).  For special immigrant religious workers, it provides visas to the aliens themselves, rather than to their employers, 8 U.S.C. § 1153(b)(4), and it contains an exception to the general disqualification for unlawful work status, so that these workers may still seek permanent residence as long as they have worked no more than 180 days unlawfully.  8 U.S.C. § 1255(k).  Further, while other employment-based visa applicants require a certification from the Department of Labor that no qualified Americans are available for the job, religious workers need only show that they have the requisite qualifications. *Compare* 8 U.S.C. § 1153(b)(3)(C) *and* 8 U.S.C. § 1182(a)(5)(A) *with* 8 U.S.C. § 1153(b)(4).

In sum, Congress has taken affirmative steps in the INA to enable qualified foreign workers to provide services to religious organizations within the United States.  *See Patel*, 732 F.3d at 636-37 (collecting authority); H.R. Rep. 101-723(I) (1990); *see also* Br. of Amicus Curiae American Immigration Lawyers Association at 3.  We therefore reject the proposition that Alencar's interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Lexmark*, 134 S. Ct. at 1389 (quoting *Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210).

### B.  Validity of the Regulation

In addressing the validity of the Regulation, we apply the two-step analysis articulated by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  If Congress has directly and clearly spoken to the

16

question at issue, our *Chevron* analysis is complete at step one, and Congress's unambiguous intent controls. *Id.* at 842-43. However, if the statute is "silent or ambiguous," or "[i]f Congress has explicitly left a gap for the agency to fill," we proceed to the second step and determine whether the agency's construction of the statute is reasonable. *Id.* at 843.

In the first step of the *Chevron* analysis, we carefully scrutinize the plain text of the statute and apply traditional tools of statutory construction. *Bautista v. Att'y Gen.*, 744 F.3d 54, 58-68 (3d Cir. 2014). Mindful of the Supreme Court's mandate that "[a] court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal citation and quotation marks omitted), we also may consider the broader statutory context and examine other parts of the governing statute to determine if the statutory language is silent or ambiguous. *See, e.g.*, *Scialabba*, 134 S. Ct. at 2204-05 (2014).

Here, the statute defines a special immigrant religious worker as an "immigrant" who has been "carrying on such vocation, professional work, or other work continuously for at least the 2-year period" preceding the application. 8 U.S.C. § 1101(a)(27)(C)(iii). The term "immigrant"—defined by the INA, with certain exceptions, as "every alien"—by its plain terms includes aliens in both legal and illegal immigration status. 8 U.S.C. § 1101(a)(15).

Because the term "carrying on" is not defined by the INA, we look to its ordinary meaning. Black's Law Dictionary defines "carry on trade or business" as "to conduct, prosecute or continue a particular avocation or

17

business as a continuous operation or permanent occupation." Black's Law Dictionary 214 (6th ed. 1991). Similarly, other dictionaries define "carry on" as "to manage" or "to conduct." OED Online (December 2014), *available at* http://www.oed.com/view/Entry/28252; The American Heritage Dictionary 286 (4th ed. 2009); Webster's Third New International Dictionary 344 (1993). None of these definitions includes a requirement of lawfulness of the action or lawful status of the actor.

Moreover, a court should interpret a statute so as to "give effect to every word of a statute wherever possible." *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004). The Regulation's requirement that qualifying work under § 1101(a)(27)(C)(iii) be "in lawful immigration status" would render another section of the INA, 8 U.S.C. § 1255(k)(2), largely, if not entirely, superfluous. That is, in providing that a specified number of days of unauthorized work will not disqualify special immigrant religious workers from applying for permanent resident status, § 1255(k)(2) necessarily assumes that some such workers will have engaged in prior unauthorized employment. Under the Regulation, on the other hand, a special immigrant religious worker could not obtain an I-360 visa—a prerequisite to applying for adjustment of status under § 1255(k)—if that worker had engaged in even a single day of unauthorized work during the two years preceding such worker's I-360 visa petition. The Regulation, in effect, would make § 1255(k)(2)'s exemption for unauthorized work meaningless in most circumstances.[8]

---

[8] While both sections could still have force in the situation where a petitioner worked in unlawful status for less

18

Furthermore, in *Russello v. United States*, the Supreme Court observed that "[w]here Congress includes particular language in one section of a statute but omits it from another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  464 U.S. 16, 23 (1983).  Section 1101(a)(27)(C)(iii) states that an alien must "carry on" his religious work "continuously" but makes no mention of "lawfully."  Elsewhere within §§ 1101 and 1153, in contrast, Congress specified no less than six times when it intended to require lawful status as a prerequisite to the grant of certain status or relief.  *See* 8 U.S.C. § 1101(a)(6) (defining a "border crossing identification card" as a document that can be issued only to an alien who is "lawfully admitted" for permanent residence); 8 U.S.C. § 1101(a)(27)(A) (creating a category of special immigrants for immigrants "lawfully admitted" for permanent residence who are returning from a temporary visit abroad); 8 U.S.C. § 1101(i)(2) (permitting aliens who are the victims of severe human trafficking to engage in employment during the period they are in "lawful temporary resident status"); 8 U.S.C. § 1153(a)(2)(A), (B) (alloting visas to the spouses, children, and unmarried sons and daughters of aliens "lawfully admitted" for permanent residence); 8 U.S.C. § 1153(b)(5)

---

than 180 days and then, during the two years immediately prior to filing the I-360 visa petition, worked legally in the United States or worked abroad, the Government cannot negate the canon against superfluity merely by pointing out that a theoretical exception exists.  *See Duncan v. Walker*, 533 U.S. 167, 174-75 (2001) (applying the canon against superfluity where a construction of the statute would render a word insignificant but not wholly superfluous).

19

(making visas available for qualified immigrant entrepreneurs whose businesses will create full time employment for, among others, aliens "lawfully admitted" for permanent residence or "lawfully authorized" to be employed in the United States).

Yet there can be no doubt Congress was well aware that special immigrant religious workers may have worked illegally before applying for legal status: An alien seeking permanent adjustment of status under 8 U.S.C. § 1255, for example, generally is ineligible if he has "continue[d] in or accept[ed] unauthorized employment prior to filing an application for adjustment of status," 8 U.S.C. § 1255(c)(2), or "was employed while the alien was an unauthorized alien," 8 U.S.C. § 1255(c)(8). For special immigrant religious workers who are present in the United States pursuant to lawful admission at the time of the application, however, the INA specifically carves out an exception to allow for adjustment of status—even if the alien engaged in unauthorized employment—so long as that unauthorized employment did not exceed 180 days in the aggregate. *See* 8 U.S.C. § 1255(k)(2). Against this backdrop, Congress's decision to specify in § 1101(a)(27)(C)(iii) that immigrants carry on their religious work "continuously," but not "lawfully," is particularly significant.

We are unswayed by the line of decisions from the Court of Appeals for the D.C. Circuit declining to apply *Russello* in the administrative agency context and observing that "a congressional mandate in one section and silence in another" may simply reflect a decision "to leave the question to agency discretion." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (quoting *Cheney R. Co. v. ICC*, 902

20

F.2d 66, 69 (D.C. Cir. 1990)). We have not adopted this reasoning, and, to the contrary, we have concluded that "we must read the statute as written," giving meaning to distinctions between statutory provisions, rather than rely on implicit assumptions of intent. *Hanif v. Att'y Gen.*, 694 F.3d 479, 486 (3d Cir. 2012).

Section 1255(k)(2) also puts to rest the Government's arguments that § 1101(a)(27)(C)(iii) must be read in connection with the statutory ban on employers hiring unauthorized aliens and that the overall structure and purpose of the INA require lawful work absent an explicit exception. *See* 8 U.S.C. § 1324a(a)-(b). Indeed, the argument proves too much, for Congress carved out just such an exception for the adjustment of status of special immigrant religious workers who engaged in unauthorized employment for an aggregate period of up to 180 days and otherwise satisfy § 1255(k). 8 U.S.C. § 1255(k)(2).

Nor are we persuaded that, when Congress directed CIS to issue regulations specific to fraud in the special immigrant *nonminister* religious worker program (the "Nonminister Program"), it thereby acknowledged ambiguity in the work qualifications for ministers. Special Immigrant Nonminister Religious Worker Program Act, Pub. L. No. 110-391, 122 Stat. 4193 (2008); *see* 8 U.S.C. § 1101(a)(27)(C)(ii)(II), (III). The Government submits that CIS adopted the Regulation as part of an agency rule intended to improve its "ability to detect and deter fraud," and that the Regulation therefore necessarily was authorized by Congress. *See* Special Immigrant and Nonimmigrant Religious Workers, 73 Fed. Reg. 72,276-01 (November 26, 2008). Some parts of this rule were clearly designed to address fraud in the

21

administration of the program, such as the provision authorizing CIS to perform an on-site inspection of a petitioning religious organization, presumably to confirm, where relevant, that the alien is actually carrying on the specified religious work, as well as to ascertain the organization's bona fides. *See, e.g.*, 8 C.F.R. § 204.5(m)(12). That purpose is not apparent, however, in a requirement that such work, actually having been performed, was performed while the alien was in a particular immigration status. Nor could that requirement, to the extent it is imposed on ministers, conceivably be aimed at fraud in the Nonminister Program.

The Government also argues that Congress indicated its acquiescence to the Regulation by reauthorizing the Nonminister Program four times since DHS adopted the Regulation.[9] However, the canon of ratification, *i.e.*, that "Congress is presumed to be aware of an administrative . . . interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), has little probative value where, as here, what is re-enacted is a different subsection of the statute. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 n.4 (2004). It has even less bearing when it is

---

[9] *See* Reauthorization of EB-5 Regional Center Program, Pub. L. No. 112-176 § 3, 126 Stat. 1325 (2012); Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83 § 568(a)(1), 123 Stat. 2142 (2009); Legislative Branch Appropriations, Pub. L. No. 111-68 § 133, 123 Stat. 2023 (2009); Special Immigrant Nonminister Religious Worker Program, Pub. L. No. 111-9 § 1, 123 Stat. 989 (2009).

contradicted by clear and unambiguous evidence of Congress's intent, reflected here in the plain language of § 1101(a)(27)(C)(iii).

In sum, by its plain terms and consistent with *Russello* and applicable canons of statutory construction, the INA authorizes an alien who engaged in religious work continuously for the two years preceding the visa application and who meets the other statutory criteria to qualify for an I-360 visa as a special immigrant religious worker. As the statute is clear and unambiguous and the Regulation is inconsistent with the statute, the Regulation is *ultra vires* and we do not reach the second step of the *Chevron* analysis.

## IV. Remedy

Having struck down the Regulation, the District Court concluded that remand would be futile and ordered CIS to grant the petition because it had offered no alternative ground for denial of Alencar's petition. Given the outcome dictated by the Regulation, however, CIS had no occasion to consider whether Alencar meets the other requirements for the special immigrant religious worker program. When further fact-finding is necessary to resolve an issue, a court of appeals "is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Accordingly, we will reverse the order granting the petition and will remand to the District Court with instructions to remand to the agency to address in the first instance whether Alencar satisfies § 1101(a)(27)(C)'s remaining criteria.

\*       \*       \*

For these reasons, we will affirm that portion of the District Court's order granting summary judgment and striking 8 C.F.R. §§ 204.5(m)(4) and (11) as *ultra vires*, will reverse the portion granting Alencar's petition, and will remand to the District Court for proceedings consistent with this opinion.